UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK TIGER, individually and on behalf of all others similarly situated,<br><br>        *Plaintiffs,*<br><br>  v.<br><br>VERIZON COMMUNICATIONS INC., and VERIZON PENNSYLVANIA LLC,<br><br>        *Defendants.* | Case No. 2:23-cv-01618-NR<br><br>FIRST AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................... 1

II.     JURISDICTION AND VENUE.......................................................... 4

III.    PARTIES ............................................................................................ 4

IV.     FACTUAL ALLEGATIONS................................................................ 6

        A.    DEFENDANTS' TOXIC LEAD CABLES                                 6

        B.    LEAD POSES SIGNIFICANT HEALTH RISKS                        9

        C.    UTILITY WORKERS WITH OCCUPATIONAL EXPOSURE TO DEFENDANTS'
              LEAD-SHEATHED CABLES ARE AT A HEIGHTENED RISK OF
              DEVELOPING FUTURE LEAD-RELATED CONDITIONS            13

        D.    DEFENDANTS WERE AWARE OF THE RISKS PRESENTED BY THE TOXIC
              LEAD CABLES BUT DID NOT TAKE MEANINGFUL ACTION.       15

        E.    FEDERAL LAWMAKERS ARE DEMANDING THAT DEFENDANTS TAKE
              ACTION TO REMEDIATE THE SIGNIFICANT RISKS POSED BY THEIR
              TOXIC LEAD CABLES                                        17

        F.    PLAINTIFF AND THE CLASS MUST BE MEDICALLY MONITORED FOR
              FUTURE LEAD-RELATED CONDITIONS                          18

V.      TOLLING / FRAUDULENT CONCEALMENT ................................. 20

VI.     CLASS ALLEGATIONS ................................................................... 22

VII.    CAUSES OF ACTION ...................................................................... 25

        COUNT 1: Negligence .................................................................... 25

        COUNT 2: Negligence Per Se ........................................................ 31

        COUNT 3: Common Law Public Nuisance ..................................... 32

VIII.   PRAYER FOR RELIEF .................................................................... 35

IX.     JURY DEMAND................................................................................ 35

Plaintiff Mark Tiger files this Complaint, individually and on behalf of all others similarly situated (individually, "Plaintiff," and, together with all others similarly situated, "Plaintiffs"), against the defendants named herein ("Defendants"), seeking relief to remedy the harms caused by Defendants' negligent operation, assessment and disposal of a sprawling network of toxic lead-sheathed telecommunications cables. Plaintiffs' allegations are based upon personal knowledge as to Plaintiffs' own conduct and investigation of counsel based on publicly available information as to all other allegations.

## I.     INTRODUCTION

1.     This case is about Defendants' profit-driven decision to leave dangerous lead cables in place after they became outdated and obsolete, in violation of Pennsylvania and federal law. That decision endangered—and endangers—utility workers whose work brought or brings them in constant direct physical contact with these lead cables. Defendants have known about this danger to utility workers for decades but made a decision to put profit above people and to expose thousands of utility workers to dangerous levels of lead.

2.     Defendants own and operate telecommunications networks in Pennsylvania and elsewhere. Defendants' infrastructure includes a sprawling network of cables covered in toxic lead: on poles overhead, in the soil, in buildings, and underwater.

3.     Defendants' predecessors—corporate affiliates of the Bell Telephone Company and American Telephone & Telegraph Company (AT&T)—laid nearly all the cables in question as they built out telephone service across the U.S. The cables have a thick jacket of lead for insulation, to prevent corrosion and to keep out water. After the breakup of the Bell telephone system in the 1980s, Defendants took ownership and control of the lead-sheathed cables in the locations in which they operated, including Pennsylvania. When technology advanced and

1

Defendants turned to plastic sheathing and, later, fiber optics, they abandoned many of the old lead-sheathed cables in place, and also abandoned the lead that washed off the cables into the surrounding environment, rather than properly disposing of those materials as required by Pennsylvania and federal law.

4.      For many years, Defendants have known that the lead-covered cables existed, that lead was potentially leaching into the environment surrounding the cables, and that the cables created significant risks of human and animal exposure. Defendants, however, have not meaningfully acted to mitigate the health risks to the individuals who work near the cables or made adequate efforts to monitor or dispose of the cables.

5.      Lead is toxic to humans and no amount of contact with lead is safe. Lead exposure presents many significant health risks, including damage to the central nervous system, kidney problems, cardiovascular problems, reproductive problems, cancer, and behavior and learning problems. Individuals exposed to lead may or may not show contemporaneous symptoms. Lead can cause health problems shortly after exposure. However, lead can also be stored inertly in the bones and other locations in the body for decades without causing immediate symptoms, and release from those locations back into circulation years or decades later, causing lead-related health problems long after the initial exposure.

6.      Defendants' toxic lead cables have been poisoning the surrounding environments for decades, and individuals who come into contact with the cables and surrounding environments are at a heightened risk of lead exposure. For example, telecom workers have reported that lead-sheathed telecommunications cables often have a dusting of silvery lead so soft and thick people would at times scribble messages in it, and numerous studies over the past 50 years have shown that utility workers who work with or near the cables have elevated levels of lead in their bodies

2

and a number of significant health issues. Further, as the lead in the cables degrades, it leaches into the surrounding soil, water and sediment, exposing those who come in contact with those environments to a heightened risk of lead poisoning. According to recent reporting by the Wall Street Journal, independent testing of water and soil samples near Defendants' and other similar lead-sheathed telecommunications cables shows that the cables are tainting the environment in and around many communities, including near schools and children's play areas.

7.      Utility workers are uniquely harmed by this misconduct. Their jobs put them in constant contact with these cables and the environmental media which surrounds them. They must manhandle these cables to do their jobs.

8.      Defendants' failure to properly assess and dispose of the cables and the lead that has leached off the cables into the surrounding environment has caused a public health crisis by unnecessarily exposing individuals in Pennsylvania and other states to toxic lead.

9.      Plaintiff and other Pennsylvania utility workers have been exposed to lead from these toxic cables for years. Because lead exposure significantly increases the risk of developing future lead-related health conditions, Plaintiff and other Pennsylvania utility workers have a present need to obtain lead testing and other medical surveillance to permit the earliest possible measurement and removal of lead in their bodies, and diagnosis and treatment of any related illnesses, which could lead to improved outcomes, prolongation of life, relief of pain, and minimization of disability.

10.      Through this Class Action Complaint, Plaintiff, individually and on behalf of the Class (defined below), seeks two forms of relief: (1) damages to compensate Plaintiff and the Class for the cost of lead testing and medical monitoring made necessary by Defendants' negligent actions, and (2) abatement to remove and properly dispose of the lead-sheathed cables in

3

Pennsylvania and surrounding lead contamination. This Complaint does not seek personal injury damages, and expressly preserves individual plaintiffs' rights to pursue the same in other litigation.

## II.   JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because: (a) there are at least 100 class members; (b) the matter in controversy exceeds $5 million, exclusive of interest and costs; and (c) at least one plaintiff is a citizen of a different state than at least one defendant.

12.     This Court has personal jurisdiction and venue over Defendants under 18 U.S.C. § 1965(b) and (d).

13.     In addition and/or in the alternative, Defendants and/or their agents or alter egos each have significant contacts with Pennsylvania because they own and operate telecommunications networks, including the lead-sheathed cables at issue, in Pennsylvania, and have derived revenue from their operation of those networks in Pennsylvania through the purposeful direction of their activities to Pennsylvania and purposeful availment of the protections of the laws of Pennsylvania, such that personal jurisdiction would be proper in Pennsylvania under traditional notions of fair play and substantial justice.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims at issue occurred in this District and because Defendants are subject to the personal jurisdiction of this Court.

## III.   PARTIES

15.     Plaintiff Mark Tiger is a resident of Commodore, Pennsylvania.  From 2019 to 2020, he was an employee of Figure 8 Communications, where he worked as a utility worker.

4

During that time, he regularly worked with and around Verizon's lead-sheathed cables, including their aerial cables, in Pittsburgh and other territories.  Since 2020, Mr. Tiger has been an employee of Duda Cable Construction, an independent contractor for Comcast Corporation ("Comcast"), where he also works as a utility worker.  While at Duda Cable Construction, Mr. Tiger regularly worked with and around Verizon's lead-sheathed cables, including their aerial cables, in Pittsburgh and other territories.  On the utility poles, Comcast shares space for its aerial cables with Verizon's lead-sheathed cables. In Pennsylvania, Comcast's aerial cables sit above Verizon's lead-sheathed cables on the utility poles. So, to reach Comcast's aerial cables, Mr. Tiger had to climb over Verizon's lead-sheathed cables. Mr. Tiger's clothes and body would regularly rub against Verizon's lead-sheathed cables as he climbed up the utility poles to reach Comcast's aerial cables. Mr. Tiger also used Verizon's lead-sheathed cables to hook in while he worked on Comcast's aerial cables. To hook in, Mr. Tiger would use his hands to wrap a strap around Verizon's lead-sheathed cables. That required him to grab Verizon's lead-sheathed cables. As Mr. Tiger perspired, he would rub his face, including his eyes and mouth, with his hands that had been in direct contact with Verizon's lead-sheathed cables. During lunch, Mr. Tiger would use his hands to eat. As a result, Mr. Tiger was in direct and regular contact with Verizon's lead-sheathed cables and ingested and inhaled lead from Verizon's lead-sheathed cables. While working with Verizon's lead-sheathed cables, Mr. Tiger was routinely sick.  His symptoms included mood changes, headaches, nausea, fatigue, irritability, muscle and joint pain, and constipation.  He did not go to see a doctor since he does not have medical insurance.  Mr. Tiger anticipates that he will be forced to work near or around Verizon's lead-sheathed cables in the future.  He is worried that the direct exposure to Verizon's lead-sheathed cables will cause him to become sick again.  Due to his direct and regular exposure to Verizon's lead-sheathed cables, Mr. Tiger now requires medical surveillance

for lead—including blood and bone testing to measure the amount of lead that is presently in his body, and any additional medical surveillance and treatment recommended by healthcare professionals—and has thus suffered a present economic injury in the form of the cost of medical care made necessary by Defendants' negligent actions.

16.     Defendant Verizon Communications Inc. ("Verizon") is a Delaware corporation with its principal place of business in New York. Acting through its subsidiaries, Verizon provides communications, technology, information and entertainment products and services to consumers, businesses and government entities.

17.     Verizon Pennsylvania LLC ("Verizon Pennsylvania" and, together with Verizon, "Defendants") is a Delaware company with its principal place of business in Pennsylvania. Verizon Pennsylvania is a wholly owned subsidiary of Verizon, and Verizon's principal operating subsidiary in Pennsylvania.

18.     Defendants own and improperly assessed and disposed of the lead-sheathed telecommunications cables at issue in this Class Action Complaint.

## IV.     FACTUAL ALLEGATIONS

### A.  DEFENDANTS' TOXIC LEAD CABLES

19.     Defendants own and operate a sprawling network of telecommunications cables covered in toxic lead that stretches across Pennsylvania and many other states—on poles overhead, in the soil, in buildings, and under the water.

20.     Defendants' predecessors—corporate affiliates of the Bell Telephone Company and AT&T—laid nearly all the cables in question prior to the 1960s as they built out telephone service across the U.S. The cables, often containing hundreds of bundled copper wires, are wrapped in a thick jacket of toxic lead.

6

21.     When Defendants' predecessors laid these cables, they were aware of these cables' dangerous propensity to leach lead. As a 1929 internal memorandum by R.M. Burns of Bell Laboratories explained, "when exposed to the atmosphere [lead] tarnishes and becomes inert owing to the formation of an oxide film which increases in thickness during a period of about ten days." Likewise, "[i]n the presence of moisture and carbon dioxide, lead becomes coated with a film of lead carbonate." This tarnish—which can have an appearance of a fine dust—creates a obvious danger to both those who handle cables and to the surrounding environment.

22.     These dangers are enhanced by rain. Rain can both wash away this tarnish or dust—in turn contaminating nearby soil—as well as deposit acids which may speed the process of corrosion. This deposition of acids is dangerous because lead is particularly susceptible to corrosion when exposed to carboxylic and nitric acids. Both carboxylic and nitric acids are commonly transported by rainwater, and are primary causes of acid rain.

23.     After the breakup of the Bell telephone system in the 1980s, Defendants took ownership and control of the lead-sheathed cables in the locations in which they operated. When technology advanced and Defendants turned to plastic sheathing and, later, fiber optics, they abandoned many of the old lead-sheathed cables in place, and also abandoned the lead that washed off of the cables into the surrounding environments, rather than properly storing and disposing of those materials as required by Pennsylvania and federal law.

24.     Defendants have been aware throughout this time that "[a]ny time old lead cable is handled, lead dust is generated and introduced into the atmosphere." See Bell System Practices, AT&T CO. Standard, "Occupational Exposure to Lead Cable Removal", Issue 1, Dec. 1979, Section 620-100-010, at ¶2.04. Yet Defendants did not warn employees of other companies or the public, who could come into contact with these cables, of these dangers.

25.     The lead from Defendants' cables can transfer to humans and cause significant health issues.

26.     According to recent reporting by the Wall Street Journal, testing by independent laboratories indicates that lead from Defendants' cables is polluting the surrounding environment and causing significant health risks to many individuals.

27.     According to recent reporting by the Wall Street Journal, testing conducted by several independent laboratories shows that lead levels in the environments near Defendants' lead-sheathed telecommunications cables (and similar lead-sheathed cables owned by other telecommunications companies) exceeds safety recommendations set by the U.S. Environmental Protection Agency.

28.     For example, the EPA's recommendation for the levels of lead in the soil for areas where children play is 400 parts per million.  In Coal Center, PA, one of Defendant's aerial lead-sheathed cables runs along the street, drooping so low in certain spots that it is nearly within arm's reach. The roughly mile-long cable runs across an entrance to apartment buildings and near a school bus stop and playground. According to recent reporting by the Wall Street Journal, testing conducted by independent laboratories shows that lead in the soil at one of the locations measured 7.5 times the amount the EPA says is safe for play areas. The testing further confirmed that the lead in the soil mirrored the lead from the cable and was unlike the background lead in that area. The lead-sheathed cable runs over the property of a 36-year-old mother of 6-year-old twins. The children played under the cable in the lot next to their house, where ground was being dug up for the foundation of a home. According to recent reporting by the Wall Street Journal, an analysis of soil collected from the family's property showed lead at a level more than 40% higher than the recommended level for play areas by the EPA.

8

29. Lead-sheathed telecommunications cables run down the bottom of the Ohio, Allegheny and Monongahela rivers.

30. In West Orange, N.J., an aerial lead-sheathed cable similar to Defendants' cables in Pennsylvania hangs across the street from Gregory Elementary School. The cable sags over tree-lined sidewalks and driveways for more than one-third of a mile, where children and their parents walk. The cable sometimes dips to about 12 feet above the ground. According to recent reporting by the Wall Street Journal, independent testing showed that the soil beneath the cable was contaminated in multiple spots and registered readings far exceeding the EPA guideline for play areas.

31. In Wappingers Falls, N.Y., an aerial lead-sheathed cable similar to Defendants' cables in Pennsylvania hangs above the perimeter of a town playground, with a jungle gym, a swing set and a basketball court. According to recent reporting by the Wall Street Journal, lead in the soil measured (a) more than 1,000 parts per million near a "CHILDREN AT PLAY" sign; and (b) 850 parts per million at the corner of the playground.

32. According to recent reporting by the Wall Street Journal, other telecommunications companies that, like Defendants, own portions of the old Bell system have also abandoned similar lead-sheathed cables in other locations around the country, and independent testing of the environment surrounding those cables showed that, like the environments surrounding Defendants' cables, there were elevated levels of lead attributable to the telecommunications cables.

**B. LEAD POSES SIGNIFICANT HEALTH RISKS**

33. Lead exposure can cause catastrophic health effects to humans, including damage to an individual's central nervous system, brain, kidneys, and cardiovascular system. For example,

lead exposure can cause reduced kidney function, decreased blood hemoglobin, neuropathy, neurological problems, decreased cognitive function, and hearing and speech problems.

34.     Lead exposure can also cause reproductive problems, including loss of sex drive, decreased fertility, infertility, reduced fetal growth, miscarriage, still birth, and premature birth. According to a recent study from health economists Daniel Grossman of West Virginia University and David Slusky of Kansas University, the fertility rate in Flint, Mich., dropped precipitously after the city decided to switch to lead-poisoned Flint River water in 2014.

35.     Lead exposure can also cause gastrointestinal symptoms, bowel changes, lung disease, muscle weakness, thyroid issues, cramps, hyperactivity, learning problems, changes in behavior or personality, headaches, vomiting, fatigue, irritability, mood changes, anemia, abdominal pain, muscle and joint pain, constipation, trouble sleeping, trouble concentrating, memory problems, and numbness in feet or legs.

36.     Lead is also classified as a probable human carcinogen by the International Agency for Research on Cancer (IARC).

37.     Lead is so harmful to humans that ingestion of lead can cause seizures, coma and even death.

38.     There is no level of exposure to lead that is known to be without harmful effects, and there is no known safe blood concentration.

39.     The Environmental Protection Agency ("EPA"), Food and Drug Administration ("FDA"), the World Health Organization ("WHO"), Centers for Disease Control and Prevention ("CDC"), and the American Medical Association ("AMA") have all independently stated that there is no safe level of lead in a human body: (a) the EPA has stated that "the Maximum Containment Level Goal for lead is zero," which EPA set "based on the best available science which shows

there is no safe level of exposure to lead"[1]; (b) the FDA has stated that "there is no known identified safe blood lead level"[2]; (c) the WHO has likewise stated that "[t]here is no known 'safe' blood lead concentration"[3]; (d) the CDC have found that "no safe blood lead level has been identified"[4]; and (e) the AMA has stated that "we know that there is no safe level of lead."[5]

40.    The World Health Organization's 2021 update of the public health impact of chemicals estimates that nearly half of the 2 million lives lost to known chemicals exposure in 2019 were due to lead exposure. Lead exposure is estimated to account for 21.7 million years lost to disability and death (disability-adjusted life years) worldwide due to long-term effects on health, with 30% of the global burden of idiopathic intellectual disability, 4.6% of the global burden of cardiovascular disease and 3% of the global burden of chronic kidney diseases.

41.    Humans can be exposed to lead through occupational and environmental sources. For example, lead exposure can result from inhalation of lead particles or ingestion of lead-contaminated dust, water and food.

42.    The body accumulates lead over a lifetime and normally releases it very slowly.

43.    The effects of lead exposure are long lasting. Even without further exposure, lead can stay in the blood for months and be stored in bones and teeth for decades.

44.    Individuals exposed to toxic lead may not develop lead-related conditions, or show lead-related symptoms, until years after the lead exposure. For example, although lead can stay in the blood for months, it can be distributed to and stored in bones and teeth for decades. Lead stored in bones and other mineralizing tissues can remain inert for many years and then release back into

---

[1] EPA, *Basic Information about Lead in Drinking Water*, (August 13, 2020).
[2] Welch, Teresa, *Lead Found in 20% of Baby Food, Report Says,* (June 19, 2017)
[3] WHO, *Lead Poisoning and Health,* (August 23, 2019)
[4] CDC, *National Biomonitoring Program, Factsheet,* (July 12, 2013)
[5] AMA, *AMA Adopts New Policies to Prevent Future Lead Poisoning*, (June 14, 2016)

circulation at a later date, damaging soft tissue and causing lead-related conditions at that time.

45.     The absorption and biological fate of lead once it enters the human body is both well understood and distinct from the biological fate of many other toxic substances. The blood carries only a small fraction of total lead body burden, and serves as the initial receptacle of absorbed lead, distributing it throughout the body, making it available to other tissues. Absorbed lead that is not excreted is exchanged primarily among three compartments: blood; mineralizing tissues (e.g., bones and teeth); and soft tissues (e.g., liver, kidneys, lungs, brain, spleen, muscles, and heart).

46.     Blood lead level is a widely used measure of exposure. Blood-lead-level tests, however, do not measure total body burden of lead and instead tend to be more reflective of recent or ongoing exposures.

47.     Mineralizing tissues (e.g., bones and teeth) carry the majority of total lead body burden in both adults and children. Lead in mineralizing tissues is not uniformly distributed. It tends to accumulate in bone regions undergoing the most active calcification at the time of exposure.

48.     Inert components of mineralizing tissues can store lead for decades. Under certain circumstances, however, previously inert lead will leave the bones and reenter the blood and soft tissue organs. Bone-to-blood lead mobilization can be unpredictable, but it increases during periods of: advanced age; broken bones; chronic disease; hyperthyroidism; immobilization (e.g., bedridden); kidney disease; lactation; menopause; physiologic stress; and pregnancy (lead in bone is released into the blood during pregnancy and becomes a source of exposure to the developing fetus). Consequently, the normally inert pool of lead in the body poses a special risk because it is a potential endogenous source of lead that can maintain exposure to the toxic effects of lead long

12

after exposure has ended.

49.    Sometimes, individuals exposed to lead have no symptoms. Other times, symptoms caused by lead exposure will not appear right away. When symptoms do occur, they may develop over weeks or months, and may flare up sporadically at irregular times.

50.    Symptoms or health effects can appear in the absence of significant current exposure because lead from past exposures can be stored in the body for decades. Thus, it is important that individuals with historical lead exposure receive special medical monitoring to, among other things, evaluate whether the patient has potential lead poisoning (including inert stores of lead in their bones or other mineralizing tissue), examine current or past lead exposures, provide chelation therapy, advise on other factors that affect the biokinetics of lead (such as poor nutrition, advanced age, broken bones, chromic disease, hyperthyroidism, immobilization (e.g., bedridden), kidney disease, lactation, menopause, physiologic stress, and pregnancy), and rule out lead poisoning as a cause of unexplained seizures or coma or any of the other conditions with which lead is associated. This special monitoring goes beyond the medical care members of the public should ordinarily receive.

## C.  UTILITY WORKERS WITH OCCUPATIONAL EXPOSURE TO DEFENDANTS' LEAD-SHEATHED CABLES ARE AT A HEIGHTENED RISK OF DEVELOPING FUTURE LEAD-RELATED CONDITIONS

51.    Current and former utility workers with occupational exposure to Defendants' lead-sheathed cables are at a uniquely high risk of lead exposure and the onset of future lead-related conditions.

52.    According to recent reporting by the Wall Street Journal, the lead-sheathed telecommunications cables can have a dusting of silvery lead so soft and thick people would at times scribble messages in it.

13

53.     In many instances, Defendants' aerial cables are attached to the same utility poles that carry other types of utility cables. Workers servicing the cables on the pole must walk on the ground underneath Defendants' lead-sheathed cables, climb up to and over the lead-sheathed cables to access the other cables on the pole, perform their work in very close proximity to the lead-sheathed cables, interact with and touch the lead-sheathed cables, and inhale the air surrounding the lead-sheathed cables.

54.     A 1980 Mount Sinai study of 90 cable splicers found that the average lead levels in the blood of 90 cable splicers was more than 27 micrograms per deciliter, six splicers had a blood-lead level of 40 or more micrograms per deciliter, half of them had symptoms, and 29% reported central nervous system symptoms. The study found that those with higher levels of lead in their bodies had more central nervous system and gastrointestinal symptoms.

55.     A 2022 Mount Sinai study of 20 Verizon workers found many had lead in their bones. 60% of workers had measurable lead in their shin bones. 45% of workers had lead at or above 10 micrograms per gram of bone, indicating increased risk of neurological or biological problems over time. Only 5% of the workers had an elevated blood-lead level, demonstrating the inadequacy of relying on current blood-level testing to measure legacy lead exposure.

56.     According to the Wall Street Journal, which recently published investigative reporting into the impact of lead-sheathed telecommunications cables on occupationally exposed telecommunications workers: (a) a worker who was occupationally exposed to lead telecommunications cables in the Bronx in the 1980s was tested for lead by NYNEX, now part of Verizon, and the testing showed significantly elevated levels of lead in his body; (b) multiple workers in the same family who were occupationally exposed to lead-sheathed telecommunications cables while working for AT&T all now have significant health issues that

can be caused by lead exposure; (c) a 2013 Minnesota OSHA investigation of another successor to the old Bell telephone system, CenturyLink, showed that a worker handling lead was exposed to airborne lead averaging 76 micrograms per cubic meter of air over eight hours, 52% above the regulator's limit; (d) a cable splicer for AT&T reported working at least once a week with aerial or underground lead-sheathed cables, and thereafter had a kidney removed after a resurgence of cancer; and (e) a cable splicer for Southern Bell and Verizon now has chronic headaches, memory loss and difficulty breathing, his wife had two miscarriage, and his daughter suffered from childhood heart problems and has been diagnosed with ADHD, all of which can be linked to occupational lead exposure.

## D. DEFENDANTS WERE AWARE OF THE RISKS PRESENTED BY THE TOXIC LEAD CABLES BUT DID NOT TAKE MEANINGFUL ACTION.

57.     For decades, Defendants and their predecessors, dating back to the old Bell system, have known that the lead in their networks was a possible health risk to their workers and had the potential to leach into the nearby environment.

58.     There were signs at the dawn of the industry that lead could harm workers. Alice Hamilton, a pioneer of modern industrial medicine and the first female faculty member at Harvard University, included telephone workers among those facing risks from lead in her 1925 book "Industrial Poisons in the United States." And as discussed above, internal Bell documents have long recognized that lead corrosion could leach lead into the atmosphere and that handling the cables creates a danger of exposure to lead dust.

59.     The old Bell system of phone companies had an embedded medical team, with medical directors and nurses who took blood tests at physicals for workers and kept detailed medical records.

60.     Studies from the 1970s and '80s show that employees of the old Bell system who

15

worked with lead cables regularly had high amounts of lead in their blood.

61.     A 1977 Bell study provided a snapshot of high lead levels among female lead-soldering workers. Based on testing, it estimated that the workers had high blood-lead levels in the range of 24 to 45 micrograms per deciliter.

62.     Blood tests showed high lead levels in cable splicers, who fixed and maintained cables. A 1978 letter between Communications Workers of America union officials said that Defendants' predecessors—corporate affiliates of the Bell Telephone Company and AT&T—have "confirmed that cable splicers may be exposed to a lead hazard," and that the company "is anxious to test splicers that may have been or are exposed to overdoses of lead."

63.     According to recent reporting by the Wall Street Journal, another worker who worked as a cable splicer for several Bell system companies for 45 years reported that company testing in the 1980s found that he had high levels of lead in his blood, but his manager told him to go back to working with lead shortly after.

64.     Between 2007 and 2016, blood-lead test results for 208 Verizon workers showed that 85, or more than 40%, had levels above 3.5 micrograms per deciliter, which is the current level at which the Centers for Disease Control and Prevention recommends seeking medical or environmental follow-up.

65.     According to recent reporting by the Wall Street Journal, one worker who retired from Verizon in 2021 after 40 years of working with lead said he raised concerns with managers about routinely pumping out water from manholes that was potentially contaminated with lead, including in front of schools. He said they told him, "If you don't feel safe, we'll send someone else."  The worker is quoted as saying: "When the manholes fill with rainwater and runoff, all the water we are pumping out is contaminated with lead dust."

16

66.     AT&T has previously noted the risks from similar lead-sheathed cables dating to the old Bell system in its network, and, over the years, AT&T officials have expressed concern about the risks these cables present to workers.

67.     At a gathering of telecom officials more than a decade ago, a senior AT&T manager cautioned the group about a little-known danger crisscrossing the nation. His topic was the toxic lead-covered cables. Weren't these ancient cables gone? "NO," his slide presentation said. "Some older metropolitan areas may still have over 50% lead cable," the slide said, and in some places they posed risks for phone-company workers and the surrounding environment. In the 2010 presentation, the manager acknowledged the environmental impact, saying that "soils retained between 83 and 98 percent of the released lead within 2 inches" from the cables.

68.     In a 2013 presentation, the same senior AT&T manager described how workers should be protected in the field, saying "POISON" signs needed to be placed visibly for technicians working with lead, and that workers handling the toxic metal should wear respirator masks and disposable Tyvek coveralls.

69.     Notwithstanding their knowledge of the risks associated with the lead-sheathed cables, Defendants have not meaningfully acted on the health risks to the individuals who work, live and play near the cables, or made adequate efforts to assess and dispose of the cables as required by Pennsylvania and federal law.

**E.  FEDERAL LAWMAKERS ARE DEMANDING THAT DEFENDANTS TAKE ACTION TO REMEDIATE THE SIGNIFICANT RISKS POSED BY THEIR TOXIC LEAD CABLES**

70.     In response to recent media reporting on the existence of the toxic lead cables, lawmakers are demanding that telecom firms act to ensure that Americans are safe.

71.     U.S. Senator Edward Markey wrote a letter to USTelecom, the industry group

representing telecom companies, including Defendants, that: "This is corporate irresponsibility of the worst kind," and [t]he telecommunications companies responsible for these phone lines must act swiftly and responsibly to ensure the mitigation of any environmental and public health effects, and "[t]he members of USTelecom that are responsible for these lead-sheathed cables have a duty—both civic and legal—to ensure that they do not put Americans in harm's way." Senator Markey further demanded that Defendants commit to "testing for soil, water, and other contamination caused by the cables," "remediating any contamination," "warning communities of the potential hazards the cables pose," and "guaranteeing medical treatment and compensation to anyone harmed by lead poisoning caused by the cables."

72.     U.S. Representative Pat Ryan said telecom companies should "do the right thing and clean up their mess." Congressman Ryan stated that: "For decades, big corporations have polluted our rivers and our drinking water, always putting their profit above the health and safety of our community. This latest failure by Verizon and AT&T is no different," and "[i]t is absolutely unacceptable that their negligence is now making it dangerous for our kids to even go to the playground. They need to clean up their mess and safely remove these cables immediately." Congressman Ryan demanded that Defendants provide information describing their efforts "to protect lineworkers who service or will be servicing these lines," including whether Defendants would provide the lineworkers with "access to both blood testing and bone testing for lead."

73.     U.S. Rep. Frank Pallone, Jr., a ranking member of the House Energy and Commerce committee, said: "There is no safe level of lead exposure—*none*—which is why I'm so disturbed by these reports of lead cable lines throughout the country," and "[i]t is imperative that these cables be properly scrutinized and addressed."

## F.  PLAINTIFF AND THE CLASS MUST BE MEDICALLY MONITORED FOR FUTURE LEAD-RELATED CONDITIONS

18

74.     Given the substantial risk of toxic lead exposure to Plaintiff and other individuals in the Class, and the risk that lead stored in the body from a prior exposure may not manifest into a lead-related condition for years or decades, Plaintiff and the Class presently require medical surveillance to monitor the extent and effect of their exposure to Defendants' toxic lead-sheathed cables, and to permit the earliest possible removal of lead from their bodies and diagnosis of any related illnesses, which could lead to improved outcomes, prolongation of life, relief of pain, and minimization of disability.

75.     Defendants provide a health monitoring program, including lead testing, to their own employees, but do not presently pay the cost of medical monitoring for other individuals exposed to lead from their toxic lead-sheathed cables.

76.     An appropriate medical monitoring program would begin with direct measurement of blood and bone-lead levels in class members. Bone lead levels should be measured with X-ray fluorescence (XRF) testing. XRF testing measures lead levels in bone. Because lead is absorbed into the bones, and because the turnover rate of lead in bone is very slow, occurring over the course of decades, XRF testing provides a noninvasive means of directly measuring long-term lead exposure. This is both (1) useful in and of itself because of the dangers of mobilization of lead from bone and (2) provides a useful proxy for the cumulative dose of lead presented over time to organs that may be harmed by lead. XRF testing can be augmented through initial and periodic blood lead tests to evaluate more recent exposures and the amount of any bone-to-blood mobilization over time. When appropriate and possible, chelation can be used to remove excess lead in the body. Other tests and treatments would also be a part of an appropriate medical monitoring program, as Plaintiff will demonstrate through expert proof.

77.     Neither XRF testing, nor blood lead tests, nor chelation are an ordinary part of

4881-4461-6092, v. 6

medical care for the general population. Such testing is necessary and valuable to class members because of their exposure to lead due to Defendants' conduct.

## V.    TOLLING / FRAUDULENT CONCEALMENT

78.    At all relevant times, Defendants and their predecessors had an obligation to warn those individuals who may come into contact with their cables of the dangerous nature of the cables, including, in particular, their tendency to leach lead.

79.    Plaintiff's claim accrued within the applicable limitations period, and Plaintiff brings this complaint within the applicable statute of limitations. Specifically, Plaintiffs bring this action within the prescribed time limits following Plaintiff's awareness of his risk of injury and Plaintiff's knowledge of the wrongful cause. Prior to such time, Plaintiff did not know and had no reason to know of his injuries and/or the wrongful cause of those injuries.

80.    Plaintiffs assert all applicable statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including the continuing tort doctrine, equitable tolling, delayed discovery, discovery rule, and/or fraudulent concealment.

81.    The continuing tort doctrine applies because Defendants' wrongful conduct in failing to remove the cables and abate the resulting nuisance is ongoing and has never ceased.

82.    The discovery rule applies to toll the running of the statute of limitations until Plaintiffs knew, or through the exercise of reasonable care and diligence should have known, of facts that Plaintiff had been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

83.    The nature of Plaintiffs' economic injuries and the causal relationship to Defendants' negligent abandonment of lead cables in Pennsylvania was not discovered, and through reasonable care and due diligence could not have been discovered until a date within the

applicable statute of limitations for filing Plaintiffs' claims.

84.    Plaintiffs bring this complaint within the applicable statute of limitations. Specifically, Plaintiffs bring this action within the prescribed time limits following Plaintiffs' awareness of their risk of injury and Plaintiff's knowledge of the wrongful cause. Prior to such time, Plaintiffs did not know and had no reason to know of their injuries and/or the wrongful cause of those injuries.

85.    The running of the statute of limitations is tolled due to equitable tolling. Defendants are estopped from relying on any statutes of limitation or repose by virtue of their acts of fraudulent concealment, through affirmative misrepresentations and omissions to Plaintiffs. Defendants affirmatively withheld and/or misrepresented facts concerning their negligent abandonment of lead cables in Pennsylvania and the health risks presented by their toxic lead cables. As a result of Defendants' misrepresentations and/or concealment, Plaintiffs were unaware, and could not have known or have learned through reasonable diligence, of facts related to Defendants' misrepresentations or omissions, that Defendants had negligent abandoned lead cables in place and caused unnecessary lead exposure to Plaintiff and other utility workers, that Plaintiff and other utility workers had been needlessly exposed to the risks alleged herein, or that those risks were the direct and proximate result of the wrongful acts and/or omissions of Defendants.

86.    Given Defendants' affirmative actions of concealment by failing to disclose this known but non-public information about the risks presented by the lead-sheathed cables and because Plaintiffs could not reasonably have known of these risks, Defendants are estopped from relying on any statutes of limitations or repose that might otherwise be applicable to the claims asserted herein.

4881-4461-6092, v. 6

## VI.    CLASS ALLEGATIONS

87.    Plaintiffs request certification pursuant to Fed. R. Civ. P 23(b)(3) or Fed. R. Civ. P 23(b)(2) on behalf of a proposed class defined as follows: all utility pole workers who were occupationally exposed to Defendants' lead-sheathed cables in Pennsylvania (the "Class"). Excluded from the Class are (a) individuals whose sole exposure to the cables was while working as an employee for Defendants, (b) governmental entities, (c) any Judge to whom this case is assigned and his/her immediate family, and (d) Plaintiffs' counsel.

88.    This class action is brought pursuant to Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to all the members of the Class, thereby making final injunctive relief or declaratory relief concerning the Class appropriate.

89.    This class action is also brought pursuant to Rule 23(b)(3) because the questions of law or fact common to the claims of Plaintiff and members of the Class predominate over any question of law or fact affecting only individual class members and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

90.    The number of class members is sufficiently numerous to make class action status the most practical method for Plaintiffs to secure redress for injuries sustained and to obtain class wide abatement relief.

91.    There are questions of law and fact raised by the named Plaintiffs' claims common to those raised by the Class(es) they seek to represent. Those include:

   i. whether lead is toxic;

   ii. whether lead-sheathed cables pose serious health risks to utility workers;

   iii. whether Defendants were aware of the existence of the lead-sheathed cables;

   iv. whether Defendants were aware of the health risks posed by the lead-sheathed cables to those exposed to the cables, including utility workers;

22

    v.   whether Defendants' lead-sheathed cables are solid waste;

    vi.   whether Defendants' lead-sheathed cables are hazardous waste;

    vii.   whether Defendants' lead-sheathed cables were abandoned;

    viii.   whether the lead that has leached off of Defendants' lead-sheathed cables into the surrounding environment is solid waste;

    ix.   whether the lead that has leached off of Defendants' lead-sheathed cables into the surrounding environment is hazardous waste;

    x.   whether the lead that has leached off of Defendants' lead-sheathed cables into the surrounding environment was abandoned;

    xi.   whether medical testing is valuable to utility workers;

    xii.   whether utility workers should be medically monitored to protect against the health risks of lead exposure;

    xiii.   whether Defendants should be required to create a fund to pay for lead testing and ongoing medical surveillance and monitoring of utility workers that Defendants exposed to the lead-sheathed cables;

    xiv.   whether Defendants should be required to abate lead hazards that they know or should know exist due to their lead-sheathed cables;

    xv.   whether Defendants' actions constitute negligence *per se;* and

    xvi.   whether Defendants should be required to warn Plaintiffs about the risks posed by Defendants' cables.

92.    Such common questions predominate over question affecting only individual members of the Class.

93.    The violations of law and resulting harms alleged by the named Plaintiffs are typical

of the legal violations and harms suffered by all Class members.

94.     Plaintiff will fairly and adequately protect the interests of the Plaintiff Class members. Plaintiffs' counsel are unaware of any conflicts of interest between the Class representatives and absent Class members with respect to the matters at issue in this litigation; Plaintiff will vigorously prosecute the suit on behalf of the Class; and Plaintiff is represented by experienced counsel with substantial experience and expertise in complex and class action litigation.

95.     Plaintiff's attorneys have identified and thoroughly investigated all claims in this action and have committed sufficient resources to represent the Class.

96.     The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice. Moreover, the prosecution of separate actions by individual members of the Class could result in inconsistent or varying adjudications with respect to individual members of the Class and/or one or more of the Defendants. Furthermore, because the damages suffered by individual Class members are relatively small, their interests in maintaining separate actions is questionable and the expense and burden of individual litigation makes it impracticable for class members to seek individual redress for the wrongs done to them. Absent a class action, Class members will continue to incur damages, and Defendant's misconduct will continue without remedy.

97.     Defendants have acted or failed to act on grounds generally applicable to all Plaintiffs, necessitating declaratory and abatement relief for the Class.

98.     Plaintiffs reserve the right to seek certification of Rule 23(c)(4) of common questions related to Defendants' knowledge, conduct, and duties.

## VII.   CAUSES OF ACTION

### COUNT 1:
### Negligence

99.     Plaintiffs incorporate the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

100.    This cause of action is brought by Plaintiff on behalf of the Class (for the purposes of this Count, "Plaintiffs") against Defendants.

101.    Defendants owed a general duty to exercise reasonable care in preventing foreseeable harm to Plaintiffs. Defendants knew that the lead cables created a risk of lead exposure to utility pole workers, and Defendants were aware of the severe consequences of lead exposure through the many studies of their own lead-exposed employees and the medical monitoring Defendants conduct of their lead exposed employees. Defendants had the opportunity and ability to properly store and dispose of the cables and remediate any lead that washed off of the cables into the surrounding environments, but instead chose to abandon the cables in place for profit reasons, at the expense of the health of Plaintiff and other Class members.

102.    Additionally, Defendants undertook, for consideration, to install and/or maintain and/or operate and/or service lead-sheathed cables in Pennsylvania that they subsequently abandoned.  Based on their undertaking, Defendants had a duty to Plaintiffs, as utility pole workers, to exercise that degree of care consistent with the degree of knowledge and skill possessed by Defendants.

103.    Defendants' duties to Plaintiffs included, but were not limited to, a duty to install and/or maintain and/or operate and/or service and/or dispose of the lead-sheathed cables in such a manner that would not endanger the health and property of Plaintiffs, a duty to take other actions consistent with the degree of knowledge and skill possessed by it, a duty to warn utility pole

25

workers and other reasonably foreseeable victims of the dangers posed by Defendants' lead-sheathed cables, and/or the duty to properly dispose of the lead-sheathed cables and to not abandon the cables in place or abandon the lead that has run off the cables into the surrounding environment.

104. Defendants also have statutory and regulatory duties under federal law. For example, lead is a hazardous substance within the meaning of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), *see* 40 C.F.R. § 302.4, and the many releases of lead from the cables suffice to subject Defendants to cleanup liability under CERCLA § 107(a)(1), 42 U.S.C. § 9607(a)(1). In addition, because they have been abandoned throughout Pennsylvania and are not being (and cannot be) recycled, the cables themselves, and the lead that has leached off of the cables to date, constitute at least solid waste under the Resource Conservation and Recovery Act ("RCRA"). *See* 40 C.F.R. § 261.2(b)(3) (definition of solid waste). In addition, upon information and belief, the cables likely constitute RCRA *hazardous* waste, given the tendency of these cables to leach lead into the environment. *See* 42 U.S.C. § 6903(5) (defining "hazardous waste" as "a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may," among other things, "pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed"); 40 C.F.R. § 261.24 (waste constitutes hazardous waste if testing shows that the waste has a propensity to leach lead into the environment). By abandoning lead-sheathed cables in Pennsylvania, Defendants appear to have flouted RCRA requirements regulating generation, storage, and disposal of solid waste, and likely the even more onerous RCRA requirements applicable to hazardous waste. Those standards require Defendants to, among other things, "accurately identify the quantities of [] hazardous waste generated," use "appropriate containers for such hazardous waste," obtain an

identification number from the EPA for each site at which Defendants disposed of the lead or cables, and certify that the method of treatment, storage, or disposal used by Defendants "is that practicable method currently available to the generator which minimizes the present and future threat to human health and the environment."  Defendants did not comply with those requirements.

105.     In addition to RCRA, Defendants also had statutory duties under Pennsylvania law. Pursuant to the Pennsylvania Hazardous Site Cleanup Act, Defendants had a duty to not "cause or allow a release of a hazardous substance." 35 Pa. Stat. Ann. § 6020.1108. Pursuant to the Pennsylvania Solid Waste Management Act, Defendants had a duty to, among other things, store or dispose of the cables in a manner that does not "create a public nuisance or [] adversely affect the public health, safety and welfare." 35 Pa. Stat. Ann. § 6018.610.

106.     The lead-sheathed cables and run-off lead Defendants disposed of throughout Pennsylvania present an imminent and substantial endangerment to health and the environment. The lead-sheathed cables in aggregate together contain, upon information and belief, many tons of lead. As described throughout this complaint, the lead presents significant health risks to individuals, like utility pole workers, who come into direct contact with the cables, and has also elevated the level of lead in the environments surrounding the cables to levels far in excess of EPA recommendations.

107.     Lead in the lead-sheathed cables came and comes into contact with water from rain, sleet, or snow, which causes the lead to drip onto the soil below, thus causing people who make physical contact with the water and soil to be exposed to lead. Other animals throughout Pennsylvania's ecosystems are exposed to lead in similar ways.

108.     There is no level of exposure to lead that is known to be without harmful effects, and there is no known safe blood concentration. Lead exposure can cause catastrophic health

27

effects to humans, including damage to an individual's central nervous system, brain, kidneys, and cardiovascular system. Lead can also cause reproductive problems, and is classified as a probable human carcinogen. Lead is also classified as a probable human carcinogen by the IARC. Lead is so harmful to humans that ingestion of lead can cause seizures, coma and even death.

109.    Defendants failed to exercise reasonable care in performing their duties, including in failing to reasonably install and/or maintain and/or operate and/or service lead-sheathed cables, which were unsafe, toxic and unsuitable for human exposure, failing to warn Plaintiffs about the risks posed by Defendants' cables, failing to reasonably dispose of the lead-sheathed cables and run-off lead and to not abandon them, and failing to comply with CERCLA, RCRA and Pennsylvania regulations.

110.    Indeed, in a recent 10-Q, which was filed with the SEC on July 28, 2023, Defendants stated that they were just then *beginning* to test the lead levels in the environments surrounding their lead-sheathed cables, and that "[o]nce we [Defendants] have the results of our testing, we will be able to better assess the situation."  In other words, over the many years Defendants owned these abandoned cables, which were needlessly exposing utility workers to health hazards and leaching lead into the surrounding the environment, Defendants did not "make an accurate determination as to whether that waste is a hazardous waste in order to ensure wastes are properly managed according to applicable RCRA regulations," as required by 42 U.S.C. § 6922(1) and 40 CFR 262.11. Having failed to make that initial determination, Defendants thereafter failed to manage the waste according to the numerous additional RCRA requirements contained in 42 U.S.C. § 6922 and 40 CFR 262.

111.    Defendants failed to exercise reasonable care for other reasons alleged throughout this Complaint, including ignoring at least several red flags that should have alerted them to the

28

relevant problems.

112.     Defendants' conduct and/or failure(s) to act constitutes gross negligence because they were so reckless that they demonstrated a substantial lack of concern for whether an injury or harm would result.

113.     Defendants' conduct was malicious, willful, and wanton as to disregard the Plaintiffs' rights, for the following reasons:

    a.  Defendants knew that Plaintiffs were relying upon them to provide safe cables that would not expose them to lead; and/or

    b.  Defendants knew that the failure to reasonably dispose of the lead-sheathed cables needlessly exposed utility workers and posed threats to public health that would result in injury and damages to Plaintiffs.

114.     Plaintiffs suffered harm resulting from Defendants' failures to exercise reasonable care, including a present economic injury in the form of the cost of medical care made necessary by Defendants' negligent actions.

115.     Defendants' failure(s) to exercise reasonable care was direct and proximate cause of the Plaintiffs' injuries, which were entirely foreseeable.

116.     As a direct and proximate result of Defendants' breach of the duties described above, Plaintiff and the Class members have been exposed to Defendants' toxic-lead cables, have sustained a significantly increased risk of developing the lead-related health problems described in this Complaint, and have suffered and will continue to suffer economic losses and expenses associated with the present need for ongoing medical monitoring.

117.     Plaintiff and the Class members exposure to Defendants' lead cables necessitates specialized testing and resultant treatment that is not generally given to the public at large. Thus,

the monitoring regime is different from that normally recommended in the absence of exposure to this risk of harm.

118.    The medical monitoring regime should include, but is not limited to, testing and diagnostic examination—including blood and bone testing for lead—that will assist in early detection and diagnosing the catastrophic health effects described in this Complaint. This diagnostic program will facilitate treatment and interventions that will mitigate the development of, and health effects associated with, the catastrophic health effects described in this Complaint.

119.    The medical monitoring regime should include, but is not limited to, testing and diagnostic examination that will assist in early detection and diagnosing the catastrophic health effects described in this Complaint. This diagnostic program will facilitate treatment and interventions that will mitigate the development of, and health effects associated with, the catastrophic health effects described in this Complaint.

120.    The available monitoring regime is reasonably necessary according to contemporary scientific principles within the medical community specializing in the diagnosis and treatment of the catastrophic health effects described in this Complaint.

121.    By monitoring and testing Plaintiffs, the risk that Plaintiffs and the Class members will suffer long-term injuries, disease, and losses without adequate treatment will be significantly reduced.

122.    Plaintiffs and the Class members seek creation of a Court-supervised, Defendants-funded medical monitoring program which will facilitate the diagnoses and treatment of Plaintiff and the Class members for the catastrophic health effects described in this Complaint. The medical monitoring should include a trust fund to pay for lead testing and additional medical monitoring and diagnosis of Plaintiff and the Class members as frequently and appropriately as necessary.

30

Plaintiffs do not seek personal injury damages in this Complaint, and expressly preserve the right of class members to seek such relief individually.

123.    Accordingly, Defendants should be required to establish a medical monitoring program that includes, among other things: (a) establishing a trust fund, in an amount to be determined, to pay for lead testing and additional medical monitoring of Plaintiff and other Class members who have been exposed to lead from the Defendants' lead-sheathed cables for the purpose of diagnosis, surveillance and treatment, as frequently and appropriately as necessary; and (b) notifying all Class members in writing that they may require frequent medical monitoring for the purpose of diagnosis, surveillance and treatment.

**COUNT 2:**
**Negligence Per Se**

124.    Plaintiffs re-allege and incorporate the allegations contained in the above paragraphs.

125.    This cause of action is brought by Plaintiff on behalf of the Class (for the purposes of this Count, "Plaintiffs") against Defendants.

126.    A presumption of negligence (negligence per se) is established where Defendants' negligence involves the violation of a statute or regulation, where the plaintiff is within the class of persons that the statute or regulation was designed to protect, and the violation is a substantial factor in the plaintiff's harm.

127.    As described above, Defendants violated RCRA by contributing to the past or present handling, storage, treatment, transportation, or disposal of a solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment, and failing to comply with the RCRA requirements and regulations governing the storage and disposal of solid or hazardous waste.

31

128.    Additionally, pursuant to the Pennsylvania Hazardous Site Cleanup Act, it is unlawful to "cause or allow a release of a hazardous substance."  Through the actions described in this Complaint, Defendants caused or allowed the release of a hazardous substance in violation of the Pennsylvania Hazardous Site Cleanup Act.

129.    Plaintiffs are within the class of persons the statutes were designed to protect. RCRA and the Pennsylvania Hazardous Site Cleanup Act were enacted in part to protect individuals—like those in the Class—who may come into contact with Defendants' solid and/or hazardous waste, or the environments around them, and be injured.

130.    Defendants' violations of these statutes and regulations were substantial factor in needlessly exposing Plaintiffs to lead and causing Plaintiffs' economic injuries in the form of the cost of medical care made necessary by Defendants' negligent actions.

## COUNT 3:
## Common Law Public Nuisance

131.    Plaintiffs incorporate the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

132.    This cause of action is brought by Plaintiff on behalf of the Class (for the purposes of this Count, "Plaintiffs") against Defendants.

133.    Defendants created, exacerbated, and maintained a public nuisance which proximately caused a present economic injury to Plaintiffs in the form of the cost of medical care made necessary by Defendants' nuisance.

134.    A public nuisance is an unreasonable interference with a right common to the general public. Defendants' conduct has created, contributed to, and maintained an ongoing, significant, unlawful, and unreasonable interference with rights common to the general public, including the public health, welfare, safety, peace, comfort, and convenience of Plaintiffs'

communities. *See* Restatement (Second) of Torts § 821B.

135.   Defendants have created, contributed to, and maintained a public nuisance by installing and/or maintaining and/or operating and/or servicing and/or unreasonably disposing of and/or abandoning lead-sheathed cables, and the lead that has run-off the cables, in ways that unreasonably interfere with the public health, welfare, and safety in Plaintiffs' communities. Plaintiffs have a common right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

136.   The interference is unreasonable because Defendants' nuisance-creating conduct:

a.   Involves a significant interference with the public health, the public safety, the public peace, the public comfort, and/or the public convenience;

b.   Was and is proscribed by state and/or federal laws and regulations at all relevant times; and/or

c.   Is of a continuing nature and, as Defendants know, has had and continues to have a significant effect upon rights common to the general public, including the public health, the public safety, the public peace, the public comfort, and/or the public convenience.

137.   The significant interference with rights common to the general public is described in detail throughout this Complaint and includes installing and/or maintaining and/or operating and/or servicing and/or abandoning lead-sheathed cables that are insulated with lead that is unsafe, toxic and unsuitable for human exposure.

138.   Defendants are liable for creating, contributing to, and maintaining the public nuisance because their intentional, knowing, and reckless, and unreasonable and/or unlawful conduct was a substantial factor in producing the public nuisance and harm to Plaintiffs.

33

139.    Defendants had control over their conduct in Plaintiffs' communities and that conduct has had an adverse effect on rights common to the general public. Defendants controlled the installation and/or maintenance and/or operation and/or servicing and/or disposal of lead-sheathed cables.

140.    It was reasonably foreseeable that Defendants' actions and omissions would result in the public nuisance and the harm to Plaintiffs described herein.

141.    The externalized risks associated with Defendants' nuisance-creating conduct as described herein greatly exceed the internalized benefits.

142.    Additionally, Defendants' conduct also created a public nuisance as a matter of Pennsylvania statute. Pursuant to the Pennsylvania Hazardous Site Cleanup Act, "[a] release of a hazardous substance … shall constitute a public nuisance." Through the actions described in this Complaint, Defendants caused or allowed the release of a hazardous substance in violation of the Pennsylvania Hazardous Site Cleanup Act, and thus their actions constitute a public nuisance pursuant to that statute.

143.    The nuisance created by Defendants' conduct is abatable.

144.    As a direct and proximate result of Defendants' tortious conduct and the public nuisance created by Defendants, Plaintiffs have been damaged.

145.    Indeed, Plaintiffs, as former and current utility workers, have been specially damaged by their direct exposure to the public nuisance.

146.    Defendants' misconduct alleged in this case was ongoing and persistent for many years.

147.    Plaintiffs are entitled to recover the cost of lead testing and any additional medical monitoring made necessary as a result of this misconduct. Plaintiffs incorporate by reference the

4881-4461-6092, v. 6

medical monitoring allegations outlined in Count I and Count II.

### VIII.    PRAYER FOR RELIEF

Plaintiff, on behalf of himself and the proposed Class, respectfully requests that the Court:

A.    Determine that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and/or 23(c)(4), direct that reasonable notice of this action be given to the Class, appoint Plaintiff as named representative of the Class, and appoint Plaintiffs' counsel as Class Counsel;

B.    Enter judgment against Defendants and in favor of Plaintiff and the Class;

C.    Grant relief to Plaintiff and the Class in the form of a medical monitoring program to be funded by Defendants;

D.    Grant relief to Plaintiff and the Class in the form of abatement for the removal and proper disposal of the lead-sheathed cables in Pennsylvania and remediation of their environmental impact;

E.    Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees, as provided by law;

F.    Award any other relief that is deemed just and proper.

### IX.    JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, on behalf of themselves and the Class, demand a trial by jury on all issues so triable.

Dated:  February 2, 2024                                  SEEGER WEISS LLP


                                                     By:  _____*/s/ Scott A. George*_____
                                                           Scott A. George
                                                        Christopher L. Ayers
                                                        Christopher A. Seeger

David R. Buchanan
Nigel P. Halliday
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
Facsimile: (973) 639-8656
cayers@seegerweiss.com
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
nhalliday@seegerweiss.com
sgeorge@seegerweiss.com

Eric S. Dwoskin
DWOSKIN WASDIN LLP
433 Plaza Real, Suite 275
Boca Raton, FL 33432
Tel.: (561) 849-8060
edwoskin@dwowas.com

Nicholas F. Wasdin
DWOSKIN WASDIN LLP
110 N. Wacker Dr.
Chicago, IL 60606
Tel.: (312) 343-5361
nwasdin@dwowas.com

*Attorneys for Plaintiffs and the putative class*

4881-4461-6092, v. 6