## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARK TIGER, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No.: 2:23-CV-01618-NR |
| v. | |
| VERIZON COMMUNICATIONS, INC., and VERIZON PENNSYLVANIA LLC, | <u>ORAL ARGUMENT REQUESTED</u> |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION <u>TO DISMISS OR STRIKE PLAINTIFF'S FIRST AMENDED COMPLAINT</u>

Leon F. DeJulius Jr. (Pa. 90383)
Sharyl A. Reisman (pro hac vice)
JONES DAY
250 Vesey Street
New York, NY 10281
Ph: (212) 326-3939
Fx: (212) 755-7306
lfdejulius@jonesday.com
sareisman@jonesday.com

Anderson T. Bailey (Pa. 206485)
JONES DAY
500 Grant St., Ste. 4500
Pittsburgh, PA 15219
Ph: (412) 394-7250
Fx: (412) 394-7959
atbailey@jonesday.com

Bridget K. O'Connor (pro hac vice)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Ph: (202) 879-3939
Fx: (202) 626-8585
boconnor@jonesday.com

*Counsel for Defendants*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 3

    I.      Plaintiff's Allegations ..................................................................... 3

    II.     Regulation Of Utility Pole Access And Related Work........................... 5

    III.    Notice Of The Alleged Hazard ......................................................... 6

ARGUMENT ....................................................................................................... 6

    I.      Plaintiff Lacks Article III Standing.................................................... 6

        A.     Plaintiff's alleged exposure does not confer standing ............................. 7

        B.     Plaintiff does not allege any risk of imminent harm................................ 9

    II.     Plaintiff's Claims Are Untimely ..................................................... 10

    III.    The Negligence Claim In Count 1 Fails As A Matter Of Law ............... 13

        A.     Plaintiff does not plead the elements of negligence................................. 13

        B.     Plaintiff does not plead the other elements required for medical monitoring................................................................................ 15

    IV.    The Negligence Per Se Claim In Count 2 Fails As A Matter Of Law................ 17

        A.     Plaintiff cannot use negligence per se to circumvent statutory limits ................................................................................ 17

        B.     Count 2 is contrary to Pennsylvania law limiting negligence per se ....... 18

        C.     Plaintiff does not plead a statutory violation to support injunctive relief ................................................................................ 20

    V.     The Public Nuisance Claim In Count 3 Fails As A Matter Of Law ................... 21

        A.     Plaintiff does not allege a special injury................................. 21

        B.     The First Amended Complaint fails to allege interference with a common right................................................................................ 22

    VI.    The Court Should Strike The Class Allegations ................................. 23

        A.     Individualized issues predominate in medical monitoring cases............. 24

        B.     Untimeliness and claim-splitting also bar the putative class ................... 27

CONCLUSION.................................................................................................... 29

i

# TABLE OF AUTHORITIES

**Page**

CASES

*325-343 E. 56th St. Corp. v. Mobil Oil Corp.*,
906 F. Supp. 669 (D.D.C. 1995) ............................................................................19

*Acosta v. Gaudin*,
2017 WL 4685548 (W.D. Pa. Oct. 18, 2017) ........................................................28

*Alaska v. Walgreen Co.*,
2024 WL 1178352 (Alaska Super. Mar. 01, 2024).................................................23

*Amchem Prod., Inc. v. Windsor*,
521 U.S. 591 (1997)................................................................................................24

*Arndt v. Johnson & Johnson*,
67 F. Supp. 3d 673 (E.D. Pa. 2014) .......................................................................12

*Atl. Richfield Co. v. Cnty. of Montgomery*,
294 A.3d 1274 (Pa. Commw. 2023) (en banc) ................................................22, 23

*Barnes v. Am. Tobacco Co.*,
161 F.3d 127 (3d Cir. 1998)................................................................12, 15, 24, 26

*Barnes v. Am. Tobacco Co. Inc.*,
984 F. Supp. 842 (E.D. Pa. 1997) ..........................................................................12

*Bell v. 3M Co.*,
344 F. Supp. 3d 1207 (D. Colo. 2018)....................................................................17

*Blanyar v. Genova Prods.*,
861 F.3d 426 (3d Cir. 2017)..............................................................................10, 11

*Boteach v. Socialist People's Libyan Arab Jamahiriya*,
759 F. Supp. 2d 548 (D.N.J. 2010) .........................................................................22

*Boysen v. Walgreen Co.*,
2012 WL 2953069 (N.D. Cal. July 19, 2012)..........................................................7

*Caleb v. CRST, Inc.*,
43 F. App'x 513 (3d Cir. 2002) ..............................................................................11

# TABLE OF AUTHORITIES
## (continued)

Page

*Cashatt v. Ford Motor Co.*,
  2021 WL 1140227 (W.D. Wash. 2021) .................................................................27

*City of Chicago v. Beretta U.S.A. Corp.*,
  821 N.E.2d 1099 (Ill. 2004) .................................................................................23

*City of Huntington v. AmerisourceBergen Drug Corp.*,
  609 F. Supp. 3d 408 (S.D. W. Va. 2022) ...............................................................23

*City of W. Sacramento v. R & L Bus. Mgmt.*,
  2018 WL 3198118 (E.D. Cal. June 27, 2018) .......................................................21

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013).....................................................................................8, 9

*Cresswell v. End*,
  831 A.2d 673 (Pa. Super. 2003) ...........................................................................14

*Dombrowski v. Gould Elecs., Inc.*,
  954 F. Supp. 1006 (M.D. Pa. 1996) ..............................................................10, 12

*Estrada v. Johnson & Johnson*,
  2017 WL 2999026 (D.N.J. July 14, 2017)...............................................................7

*Gates v. Rohm and Haas Co.*,
  655 F.3d 255 (3d Cir. 2011)......................................................................24, 26, 27

*Gay v. A.O. Smith Corp.*,
  586 F. Supp. 3d 354 (W.D. Pa. 2022)....................................................................14

*Gonzalez v. Corning*,
  317 F.R.D. 443 (W.D. Pa. 2016), *aff'd*, 885 F.3d 186 (3d Cir. 2018)...................27

*Hallstrom v. Tillamook Cnty.*,
  493 U.S. 20 (1989).................................................................................................18

*Hubert v. Gen. Nutrition Corp.*,
  2017 WL 3971912 (W.D. Pa. Sept. 8, 2017)...........................................................7

*Huertas v. Bayer U.S., LLC*,
  2023 WL 3773139 (D.N.J. May 23, 2023) ..............................................................7

iii

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Hughes v. Chattem, Inc.*,
    818 F. Supp. 2d 1112 (S.D. Ind. 2011) ...................................................................7

*In re Avandia*,
    2011 WL 4006639 (E.D. Pa. 2011) ......................................................................15

*In re E.I. du Pont de Nemours and Co. C-8 Personal Injury Litig.*,
    2015 WL 4092866 (S.D. Ohio July 6, 2015) .......................................................18

*In re Fruit Juice Prod. Mktg. & Sales Pracs. Litig.*,
    831 F. Supp. 2d 507 (D. Mass. 2011) ...................................................................7

*In re Johnson & Johnson*,
    903 F.3d 278 (3d Cir. 2018).............................................................................8, 10

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
    193 F.3d 781 (3d Cir. 1999)..................................................................................17

*In re Paulsboro Derailment Cases*,
    746 F. App'x 94 (3d Cir. 2018) ...........................................................................17

*In re Ry. Indus. Emp. No-Poach Antitrust Litig.*,
    395 F. Supp. 3d 464 (W.D. Pa. 2019)...................................................................24

*In re St. Jude Med., Inc.*,
    425 F.3d 1116 (8th Cir. 2005) .............................................................................24

*In re Wawa, Inc. Data Sec. Litig.*,
    2021 WL 1818494 (E.D. Pa. May 6, 2021) .........................................................17

*Iorfido v. Domtar Paper Co., LLC*,
    2024 WL 1346641 (W.D. Pa. Mar. 29, 2024) .....................................................12

*James v. Johnson & Johnson Consumer Cos., Inc.*,
    2011 WL 198026 (D.N.J. Jan. 20, 2011) ..............................................................7

*Jones v. BRG Sports, Inc.*,
    2019 WL 3554374 (N.D. Ill. Aug. 1, 2019) ........................................................27

*Kimca v. Sprout Foods, Inc.*,
    2022 WL 1213488 (D.N.J. Apr. 25, 2022) ............................................................6

iv

# TABLE OF AUTHORITIES
## (continued)

Page

*Koronthaly v. L'Oreal USA, Inc.*,
374 F. App'x 257 (3d Cir. 2010) ............................................................6

*Lafferty v. Sherwin-Williams Co.*,
2018 WL 3993448 (D.N.J. Aug. 21, 2018) ....................................16, 25

*Lead Poisoning and Health*
(August 23, 2019) ..................................................................................4

*Living Lands, LLC v. Cline*,
657 F. Supp. 3d 831 (S.D. W. Va. 2023) ...............................................20

*McGee v. S-L Snacks Nat'l*,
982 F.3d 700 (9th Cir. 2020) ..................................................................6

*Meghrig v. KFC W.*,
516 U.S. 479 (1996) ..............................................................................18

*Mehr v. FIFA*,
115 F. Supp. 3d 1035 (N.D. Cal. 2015) ..................................................9

*Mest v. Cabot Corp.*,
449 F.3d 502 (3d Cir. 2006).................................................................18

*Morena v. S. Hills Health Sys.*,
462 A.2d 680 (Pa. 1983) ......................................................................13

*Moussouris v. Microsoft Corp.*,
2016 WL 6037978 (W.D. Wash. Oct. 14, 2016) ..................................28

*Nafar v. Hollywood Tanning Sys., Inc.*,
339 F. App'x 216 (3d Cir. 2009) ..........................................................28

*Ott v. Unclaimed Freight Co.*,
577 A.2d 894 (Pa. Super. 1990).............................................................14

*Pa. Soc. for Prevention of Cruelty to Animals v. Bravo Enter., Inc.*,
237 A.2d 342 (Pa. 1968) ......................................................................21

*Paige v. Phila. Hous. Auth.*,
2003 WL 22135961 (E.D. Pa. Aug. 18, 2003) .....................................24

# TABLE OF AUTHORITIES
## (continued)

Page

*PECO v. Hercules, Inc.*,
    762 F.2d 303 (3d Cir. 1985)...........................................................................21, 22

*Reilly v. Gould, Inc.*,
    965 F. Supp. 588, 601-03 (M.D. Pa. 1997)................................................24

*Pettrey v. Enter. Title Agency, Inc.*,
    241 F.R.D. 268 (N.D. Ohio 2006) .............................................................28

*Ries v. Amtrak*,
    960 F.2d 1156 (3d Cir. 1992).................................................................17, 18

*Rudy v. A-Best Prod. Co.*,
    870 A.2d 330 (Pa. Super. 2005)................................................................14

*Russell v. Chesapeake Appalachia, L.L.C.*,
    2014 WL 6634892 (M.D. Pa. Nov. 21, 2014) ..........................................20

*Schweitzer v. Consol. Rail Corp.*,
    758 F.2d 936 (3d Cir. 1985)......................................................................15

*Semenko v. Wendy's Int'l, Inc.*,
    2013 WL 1568407 (W.D. Pa. Apr. 12, 2013)............................................24

*Slemmer v. McGlaughlin Spray Foam Insulation, Inc.*,
    2013 WL 5655480 (E.D. Pa. Oct. 17, 2013).........................................15, 16

*Slippery Rock Area Sch. Dist. v. Tremco, Inc.*,
    2016 WL 3198122 (W.D. Pa. June 9, 2016)..............................................28

*State ex rel. Hunter v. Johnson & Johnson*,
    499 P.3d 719 (Okla. 2021) ........................................................................23

*State v. Lead Indus., Ass'n, Inc.*,
    951 A.2d 428 (R.I. 2008) ..........................................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).....................................................................................4

*Thompson*,
    2004 WL 62710, at *2 ..........................................................................26, 27

# TABLE OF AUTHORITIES
## (continued)

Page

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ................................................................................7, 8

*Trinity Indus. v. Greenlease Holding Co.,*
   35 F. Supp. 3d 698 (W.D. Pa. 2014) .....................................................19, 20

*Trump v. New York,*
   592 U.S. 125 (2020) ......................................................................................9

*Tsao v. Captiva MVP Rest. Partners, LLC,*
   986 F.3d 1332 (11th Cir. 2021) .....................................................................8

*Wademan v. Concra,*
   13 F. Supp. 2d 295 (N.D.N.Y. 1998) .........................................................18

*Wagner v. Anzon, Inc.,*
   684 A.2d 570 (Pa. Super. 1996) ..................................................................19

*Wisniski v. Brown & Brown Ins. Co. of PA,*
   906 A.2d 571 (Pa. Super. 2006) ..................................................................13

**STATUTES**

18 P.S.
   § 6905 .............................................................................................................5

35 P.S.
   § 6020.102 ....................................................................................................19
   § 6020.1108 ..................................................................................................20
   § 6020.1115 ..................................................................................................17

42 P.S.
   § 5524 ...........................................................................................................10

42 U.S.C.
   § 6902 ...........................................................................................................19
   § 6972 .....................................................................................................17, 20

47 U.S.C.
   § 224 .........................................................................................................5, 14

**TABLE OF AUTHORITIES**
(continued)

**Page**

OTHER AUTHORITIES

29 C.F.R.

§ 1910.268...................................................................................................5, 11

§ 1910.1025.................................................................................................5, 11

43 Fed. Reg. 52952 (Nov. 14, 1978)....................................................................6

46 Fed. Reg. 6134 (Jan. 21, 1981) ......................................................................6

52 Pa. Code § 77.3 ...............................................................................................5

Fed. R. Civ. P. 9 .................................................................................................12

Fed. R. Civ. P. 23 .........................................................................................23, 24

Restatement (Second) of Torts § 288..................................................................19

Restatement (Second) of Torts § 821B..........................................................22, 23

Restatement (Second) of Torts § 821C..........................................................21, 22

## **INTRODUCTION**

The First Amended Complaint ("FAC") suffers from the same deficiencies as Plaintiff's original Complaint—vague allegations that are not sufficiently tied to Verizon and do not plausibly allege any actual injury. Plaintiff seeks sweeping, state-wide relief based on alleged workplace exposure to lead-sheathed cables while employed by third-parties, not Verizon. Yet Plaintiff concedes that: (i) he does not know whether this work resulted in an actual increase to his blood-lead level; (ii) he has no claim for personal-injury damages; (iii) there are innumerable sources of lead exposure found throughout the environment; and (iv) the alleged hazard has been well known for decades. Indeed, Plaintiff requests medical monitoring just to determine whether there is lead in his system at all. His claims fail as a matter of law for multiple reasons.

***First***, Plaintiff lacks standing. Plaintiff disclaims personal-injury damages and instead alleges a "present economic injury," FAC ¶ 15, described as the ***possible***, ***future*** costs of medical monitoring. Plaintiff cannot cite the hypothetical expense of future testing that he seeks as a remedy in this case as a present, existing economic injury. Moreover, his claim for testing just to see if there is lead in his system only demonstrates the lack of any other present injury. Plaintiff also fails to plead that any alleged future harm is sufficiently impending. Despite years of experience working around cables, Plaintiff does not claim to have lead in his system and does not claim to have been diagnosed with a lead-related condition. He also concedes that the body can excrete lead naturally, and that individuals exposed to lead may never develop any lead-related condition. Speculation about possible ingestion of lead that might one day cause harm does not establish Article III standing. *See* Arg. § I.

***Second***, all claims separately fail as a matter of law under the governing statute of limitations, which is two years for all claims. Plaintiff alleges that he began working around utility

poles in 2019, that the alleged workplace hazard from lead-sheathed cables is "obvious," and that the potential for lead exposure from telecom cables had been analyzed and studied by researchers and labor unions for decades. *See, e.g.*, FAC ¶¶ 6, 21, 54, 62. The federal government has been regulating workplace lead exposure for telecom workers since the 1970s. Under Third Circuit precedent, Plaintiff's claims accrued more than two years before he filed suit, and the FAC fails to plead any basis for excusing the delay in filing suit. *See* Arg. § II.

**Third**, Plaintiff fails to plead the substantive elements of his three causes of action. For the Negligence claim (Count 1), any duty to protect Plaintiff from workplace lead exposure lay with **his employers**. Plaintiff cannot shift that duty to Defendants, and he also fails to plead other elements of a negligence claim for medical monitoring, including proximate causation, significant exposure to lead, and a distinct increased risk of a serious latent disease. *See* Arg. § III. Plaintiff cannot overcome these pleading deficiencies by bootstrapping an alleged violation of the Resource Conservation and Recovery Act ("RCRA") and Hazardous Sites Cleanup Act ("HSCA") into a Negligence Per Se claim (Count 2). The FAC wrongly attempts to circumvent the enforcement regimes for those statutes, is contrary to Pennsylvania precedent on the use of negligence per se, and does not plausibly allege any underlying statutory violation. *See* Arg. § IV. Plaintiff's alleged exposure to lead in a specialized, occupational role also cannot support a Public Nuisance claim (Count 3), which fails because Plaintiff has not alleged the elements of special injury and public right. *See* Arg. § V.

**Finally**, Plaintiff's class allegations separately fail as a matter of law and should be stricken. Medical monitoring claims necessarily implicate too many individualized circumstances and are irreconcilable with the requirements for class treatment under Rule 23, as is Plaintiff's reliance on individualized tolling doctrines to avoid the statute of limitations. Plaintiff's attempt to disclaim

on a class-wide basis any request for personal-injury damages constitutes improper claim splitting that separately bars him from proceeding on a class basis. *See* Arg. § VI.

For each of these reasons, the FAC should be dismissed.[1]

## **BACKGROUND**

### I.    **Plaintiff's Allegations**

Plaintiff Mark Tiger does not claim to have ever worked for Verizon. He alleges that he was an employee of Figure 8 Communications from 2019 to 2020, and of Duda Cable Construction, an independent contractor for cable television provider Comcast Corporation, since 2020. FAC ¶ 15. For each of these companies—all non-parties to this action—Plaintiff allegedly serviced equipment on utility poles where lead-sheathed telecom cables were also located. *Id.* As Plaintiff alleges, "other telecommunications companies" strung these cables before Verizon existed and continue to use them today. *Id.* ¶ 27; *see also id.* ¶ 3. Although his work around lead-sheathed cables has evidently stopped, Plaintiff "anticipates that he will be forced to work near or around Verizon's lead-sheathed cables in the future." *Id.* ¶ 15.

The FAC asserts that these lead-sheathed cables posed an "obvious" danger in his workplace. *Id.* ¶ 21. Plaintiff's work allegedly brought him into "direct" and "regular" contact with these cables, after which Plaintiff would eat or rub his face, eyes, and mouth. *Id.* ¶ 15. While Plaintiff claims to have experienced "symptoms" like "mood changes, headaches, nausea, fatigue, irritability, muscle and joint pain, and constipation," *id.*, he does not expressly attribute those commonplace symptoms to lead exposure, or to Verizon, specifically; does not claim to have ever

---

[1] For convenience, Defendants are collectively referred to herein as "Verizon," but they are distinct entities and not similarly situated for purposes of the alleged claims. Verizon Communications Inc. and Verizon New Jersey, Inc., each reserves all arguments that it is not properly named as a Defendant.

been diagnosed with any lead-related condition; does not allege that he has ever had lead in his system, much less at heightened levels; and expressly disclaims personal-injury damages. *Id.* ¶ 10. Nor does Plaintiff claim to have ever spent money on lead testing or medical treatment.

Moreover, Plaintiff concedes that there are innumerable sources of lead regularly encountered in everyday life. As the materials incorporated into the FAC demonstrate, lead is a naturally occurring chemical element found in the Earth's crust. Historically, it also has had commercial uses, including as an additive in paint and gasoline, and in the manufacture of pipes and cookware. People are exposed to lead in soil, baby formula, juice, vegetables and other food, and water from leaded pipes.[2]

Despite implicitly acknowledging in the FAC that he may have been exposed to lead from myriad other sources, Plaintiff brings Negligence, Negligence Per Se, and Public Nuisance claims against Verizon and on behalf of a class defined as "all utility pole workers who were occupationally exposed to Defendants' lead-sheathed cables in Pennsylvania." FAC ¶ 87. Plaintiff requests two forms of relief: (1) "a Court-supervised, Defendants-funded medical monitoring program … to pay for lead testing and additional medical monitoring"; and (2) "abatement to remove and properly dispose of the lead-sheathed cables in Pennsylvania and surrounding lead contamination." *Id.* ¶¶ 10, 12.

---

[2] *See generally* Center for Disease Control, *National Biomonitoring Program Factsheet* (July 12, 2013) ("CDC Factsheet"). The CDC Factsheet, which is available at https://www.cdc.gov/biomonitoring/lead_factsheet.html, is cited in the FAC and thus incorporated into the pleadings. *See* FAC ¶ 39 n.4. Accordingly, it may be considered at the motion-to-dismiss stage. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The prevalence of lead is also discussed in World Health Organization, *Lead Poisoning and Health* (August 23, 2019), and Welch, Teresa, *Lead Found in 20% of Baby Food, Report Says* (June 19, 2017), both also incorporated into the pleadings. *See* FAC ¶ 39 nn.2-3.

## II.    Regulation Of Utility Pole Access And Related Work

Utility poles are regulated components of essential telecom infrastructure, and access to the cables they support is restricted.  *See, e.g.*, 18 P.S. § 6905 (criminalizing unauthorized pole attachments); 52 Pa. Code § 77.3 (exercising regulatory oversight over terms of access to utility poles).  Under federal law, however, cable television providers like Comcast and their contractors have a right of "nondiscriminatory access" to these poles so that they can use existing infrastructure to support their own equipment.  47 U.S.C. § 224(f).

At the same time, federal law obligates companies like Comcast and Duda Cable to protect the workers they send up these poles.  The Occupational Safety and Health Administration has promulgated at least two sets of comprehensive rules on workplace safety in this environment. The first "sets forth safety and health standards that apply to the work conditions … performed … at telecommunications field installations," including "the installation, operation, [and] maintenance … [of] equipment used for signal or communication service."  29 C.F.R. § 1910.268(a)(1).  Among other things, Section 1910.268 requires that a worker's "employer" provide tools and protective equipment needed for their work, which may include insulated clothing, climbing gear, and eye protection.  *Id.* § 1910.268(e).  The "employer" must also train its employees on applicable precautions and practices, including the "[r]ecognition and avoidance of dangers relating to encounters with harmful substances."  *Id.* § 1910.268(c)(1).

The second set of rules addresses "occupational exposure to lead."  *Id.* § 1910.1025(a)(1). That rule requires each worker's "employer" to monitor lead exposure.  *Id.* § 1910.1025(d).  Where an employee faces potential exposure to lead in the course of employment, his or her "employer" must provide training and information about substance identification and exposure limits.  *Id.* § 1910.1025(d)(d)(i)-(ii).  If exposure exceeds action levels and permissible limits, the worker's "employer" must take additional precautions, including personal protective equipment and

medical screening. *Id.* § 1910.1025(e), (j). This rule also prohibits the consumption of food or beverages in areas where employees are exposed to heightened lead levels, and it requires that the "employer" ensure that employees exposed to heightened lead levels wash their hands and face before eating. *Id.* § 1910.1025(i)(4).

### III.    Notice Of The Alleged Hazard

Any hazard from working around lead in telecom equipment has been well-known for decades. For example, OSHA's lead workplace regulations were first promulgated in the 1970s. 43 Fed. Reg. 52952 (Nov. 14, 1978) (rule-making for occupational exposure to lead); *see also* 46 Fed. Reg. 6134 (Jan. 21, 1981) (discussing lead-sheathed cables). And as Plaintiff acknowledges, third-party researchers have been publishing articles about this potential source of lead exposure for "the past 50 years," FAC ¶ 6, while the Communications Workers of America—the union that represents communications workers like Plaintiff—was aware in 1978 that "cable splicers may be exposed to a lead hazard." *Id.* ¶ 62; *see also id.* ¶ 53. Plaintiff himself alleges that lead-sheathed cables pose an "obvious danger to … those who handle cables." *Id.* ¶ 21.

### ARGUMENT

### I.    Plaintiff Lacks Article III Standing.

Courts regularly hold that the mere exposure to an alleged toxin does not confer standing to sue. *See Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257, 259 (3d Cir. 2010) (no standing to bring claims alleging exposure to lead in lipstick); *McGee v. S-L Snacks Nat'l*, 982 F.3d 700, 702-03 (9th Cir. 2020) (no standing to bring claims alleging consumption of partially hydrogenated oils in popcorn); *Kimca v. Sprout Foods, Inc.*, 2022 WL 1213488, at *5-6 (D.N.J. Apr. 25, 2022)

(no standing to bring claims alleging consumption of lead in baby food).[3]  Rather, to plead standing, Plaintiff must allege that he "suffered an injury in fact that is concrete, particularized, and actual or imminent," was "likely caused" by Verizon, and is redressable through the relief sought. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  Standing also "is not dispensed in gross" for all purposes.  *Id.* at 431.  Plaintiff must plead standing for each claim asserted and each remedy sought.  *Id.*  The FAC fails to meet these pleading requirements.

## A.    Plaintiff's alleged exposure does not confer standing.

The FAC fails to plead that Plaintiff has suffered any concrete injury caused by Verizon's lead-sheathed cables and redressable by the remedies sought.  Plaintiff does not claim that there is currently any lead in his system, from a Verizon cable or otherwise, and does not claim to have been diagnosed with any condition allegedly caused by lead.  Plaintiff also recognizes that the body can naturally process lead, that those who ingest lead may never develop any lead-related condition, and thus that exposure to lead does not invariably cause injury.  FAC ¶¶ 44, 45.  Indeed, Plaintiff expressly is not "seek[ing] personal injury damages."  *Id.* ¶ 10.

---

[3] *See also Huertas v. Bayer U.S., LLC*, 2023 WL 3773139, at *11 (D.N.J. May 23, 2023) (no standing to bring claims alleging exposure to benzene); *Hubert v. Gen. Nutrition Corp.*, 2017 WL 3971912, at *8 (W.D. Pa. Sept. 8, 2017) ("[A]pprehension concerning future health consequences is insufficient to establish an injury-in-fact."); *Estrada v. Johnson & Johnson*, 2017 WL 2999026, at *1 (D.N.J. July 14, 2017) (no standing to bring claims alleging exposure to talc in baby powder); *Boysen v. Walgreen Co.*, 2012 WL 2953069, at *1 (N.D. Cal. July 19, 2012) (no standing to bring claims alleging consumption of arsenic and lead in fruit juice); *In re Fruit Juice Prod. Mktg. & Sales Pracs. Litig.*, 831 F. Supp. 2d 507, 510-12 (D. Mass. 2011) (no standing to bring claims alleging consumption of lead in juice and packaged fruit products); *Hughes v. Chattem, Inc.*, 818 F. Supp. 2d 1112, 1116-20 (S.D. Ind. 2011) (no standing to bring claims alleging consumption of hexavalent chromium); *James v. Johnson & Johnson Consumer Cos., Inc.*, 2011 WL 198026, at *2 (D.N.J. Jan. 20, 2011) (no standing to bring claims alleging exposure to methylene chloride in baby shampoo).

The FAC instead rests on the conclusory allegation that Plaintiff has "suffered a present economic injury in the form of the cost of medical care made necessary by Defendants' negligent actions." FAC ¶ 15. But "conclusory assertions of economic injury" are insufficient "to establish standing," *In re Johnson & Johnson*, 903 F.3d 278, 285 (3d Cir. 2018), and Plaintiff does not plausibly allege either a present economic harm, or an injury that might trigger future economic harm. To start, Plaintiff does not claim to have ever spent money on blood-lead tests or other procedures, so there is no past economic harm. The only medical care alleged is future testing to confirm whether there is lead in Plaintiff's system. *See, e.g.*, FAC ¶ 76. The cost of ***future*** testing is not a ***present*** economic harm. Moreover, the fact that Plaintiff seeks testing just to confirm whether there is lead in his system only demonstrates that any other harm from past exposure is speculative at best. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013) (plaintiffs "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending"); *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1344-45 (11th Cir. 2021) (holding in a data-breach case that costs plaintiffs allegedly incurred to protect against a non-imminent risk of harm cannot confer standing).

It is irrelevant that Plaintiff has allegedly experienced commonplace ailments like headaches and fatigue. FAC ¶ 15. He is not seeking to recover personal-injury damages for past symptoms. *See id.* ¶ 10. Moreover, the FAC does not plausibly trace any past symptoms to Verizon. Everyone can claim to have experienced the types of routine complaints that Plaintiff references, and he does not allege any basis for attributing those symptoms to lead from a Verizon lead-sheathed cable instead of the innumerable other potential causes. *See TransUnion*, 594 U.S. at 423 (plaintiff must plausibly allege that the defendant "likely caused" the injury in question). Nor does the FAC plead how any past symptoms could be redressed by medical monitoring or

abatement.  Those remedies concern only the detection of possible future manifestation of disease, as well as the prevention of future exposure.  *See Mehr v. FIFA*, 115 F. Supp. 3d 1035, 1060 (N.D. Cal. 2015) (holding that an athlete who suffered a concussion lacked standing to seek medical monitoring or injunctive relief regarding player safety where the past concussion was a "one-time event, the symptoms of which ha[d] fully resolved").  Plaintiff thus fails to adequately plead that any past symptoms are either traceable to Verizon, or redressable by the remedies sought here.

### B.      Plaintiff does not allege any risk of imminent harm.

For allegedly imminent harm to qualify as an injury-in-fact under Article III, a plaintiff must show that the harm is "certainly impending." *Clapper*, 568 U.S. at 402.  Future harm that turns on conjecture, speculation, or "guesswork" is insufficient. *Trump v. New York*, 592 U.S. 125, 132 (2020); *Clapper*, 568 U.S. at 414.

The FAC fails to plead any "certainly impending" injury.  Plaintiff instead relies on a cascading series of impermissibly speculative leaps.  ***First***, Plaintiff alleges he sometimes—in contravention of OSHA guidance—rubbed his face or ate lunch after touching lead-sheathed cables, but only assumes that he ingested lead because of such actions.  FAC ¶ 15.  ***Second***, Plaintiff speculates about whether there is currently lead in his system and at what level.  *See id.* ¶ 74.  ***Third***, Plaintiff assumes that any lead in his system came from ***Verizon*** cables, and not those of another telecom carrier or carriers, the electrical utilities that also place equipment on utility poles, or any of the innumerable other environmental sources of lead alleged in the FAC.  ***Fourth***, if he has ingested lead, Plaintiff can only speculate whether that will ever manifest in an illness, acknowledging that "[s]ometimes, individuals exposed to lead have no symptoms." *Id.* ¶ 49.  That is not sufficient to plead any "certainly impending" injury.  *Clapper*, 568 U.S. at 414.

Plaintiff's speculation that he "will be forced to work near or around Verizon's lead-sheathed cables in the future" also does not confer standing. FAC ¶ 15. Even assuming Plaintiff might in the future work on utility poles, courts must afford him "the dignity of assuming that []he acts rationally, and that []he will not act in such a way that []he will again suffer the same alleged 'injury.'" *In re Johnson & Johnson*, 903 F.3d at 293. Plaintiff has subjective knowledge of the "obvious" hazard he alleges, and is entitled to employer-provided workplace protections and training under federal law. The Court may therefore assume that Plaintiff's employer will comply with its legal duties to provide Plaintiff with required protections and safety training; that Plaintiff will make use of the existing protections against lead exposure that are available to him; and that he will not engage in the voluntary conduct—touching his face and eating lunch after working around cables—that he says may have exposed him to lead. Plaintiff cannot manufacture standing by intentionally causing the alleged harm. There is no plausible risk of future lead exposure that sufficiently supports an allegation of impending harm for standing purposes.

Standing to sue under these circumstances would open the floodgates to speculative litigation about all manner of everyday experiences. Lead is a chemical element that is naturally present in the environment, was added to gasoline for decades, is commonly found in all manner of consumer products, and is routinely encountered in the air we breathe, the food we eat, and the water we drink. If mere exposure to lead becomes sufficient to establish standing for medical monitoring and abatement claims, the line to the courthouse doors would be endless.

## II.    Plaintiff's Claims Are Untimely.

Each of Plaintiff's claims is subject to a two-year statute of limitations. *See* 42 P.S. § 5524; *see also Blanyar v. Genova Prods.*, 861 F.3d 426, 431 (3d Cir. 2017) (affirming dismissal of claims seeking medical monitoring brought outside two-year limitations period); *Dombrowski v. Gould*

*Elecs., Inc.*, 954 F. Supp. 1006, 1010, 1013-14 (M.D. Pa. 1996) (dismissing negligence and nuisance claims brought outside two-year limitations period). Because the FAC and other sources that the Court may consider "facially show[] noncompliance with the limitations period," dismissal with prejudice is appropriate. *Caleb v. CRST, Inc.*, 43 F. App'x 513, 515 (3d Cir. 2002).

Dismissal on statute of limitations grounds is warranted where the allegations demonstrate that, more than two years before filing suit, the plaintiff was at least on "inquiry notice" of his claim, such as through the "wide availability of information documenting the risk of exposure" or "regulation by the federal government." *Blanyar*, 861 F.3d at 432-33. That occurred in 2019, when Plaintiff began working for Figure 8. Compl. ¶ 15. By that time, the potential for exposure to lead from working around telecom cables was well known, OSHA had been regulating telecom work on utility poles and occupational lead exposure for decades, and the union representing communications workers had been aware for decades that lead from cables could cause harm. *See, e.g.*, FAC ¶¶ 6, 62; *see also* 29 C.F.R. §§ 1910.268, 1910.1025 (both initially codified in the 1970s). Plaintiff was, as a matter of law, on notice in 2019 that he was "work[ing] with" and potentially "being exposed to" a toxic substance. *Blanyar*, 861 F.3d at 432.

Plaintiff tries to avoid dismissal by summarily invoking various exceptions to toll the limitations period. *See* FAC ¶¶ 78-86. Each exception is inapplicable.

***Discovery Rule.*** To survive a motion to dismiss based on the discovery rule, the pleadings must plausibly demonstrate "the plaintiff's ***complete inability***, due to facts and circumstances not within his control, to discover an injury despite the exercise of due diligence." *Blanyar*, 861 F.3d at 431-32 (citation omitted; emphasis added). But the allegations and judicially noticeable federal regulations demonstrate that Plaintiff could have discovered all of the information necessary for his claim in 2019, when he became a utility worker. *See id.* Plaintiff fails to allege any fact or

11

circumstance outside of his control that prevented him from discovering his alleged exposure and purported need for medical monitoring due to exposure to lead-sheathed cables.

**_Fraudulent Concealment._**  Nor can Plaintiff adequately allege equitable tolling based on fraudulent concealment, which requires "an independent affirmative act of concealment" pleaded with particularity under Rule 9(b).  *Arndt v. Johnson & Johnson*, 67 F. Supp. 3d 673, 678-9 (E.D. Pa. 2014).  The conclusory claim that Verizon made "affirmative misrepresentations and omissions" is unsubstantiated by any factual allegations.  FAC ¶ 85.  Plaintiff does not identify a single statement or omission made by either Defendant, much less a **_deceptive_** statement.  Nor does he allege that he ever communicated with Defendants, was in any position to hear an allegedly misleading statement, or could have reasonably relied on such a statement to his detriment. Moreover, "fraudulent concealment only tolls the limitations period until the plaintiff *should have been* aware of the injury or its cause."  *Arndt*, 67 F. Supp. 3d at 678.  As set forth above, Plaintiff was on notice of his purported claims in 2019.

**_Continuing Tort_**.  Plaintiff's invocation of the continuing tort rule likewise fails. Pennsylvania courts and the Third Circuit have specifically rejected this rule's applicability to negligence claims premised on toxic exposure cases, holding that the discovery rule applies instead. *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 154 (3d Cir. 1998) (limitations period began to run when plaintiffs knew or should have known about their alleged injury); *see also Barnes v. Am. Tobacco Co. Inc.*, 984 F. Supp. 842, 858 (E.D. Pa. 1997) (collecting cases).  Similarly, public nuisance claims predicated on alleged environmental contamination are considered "permanent" nuisance cases that accrue at the time of initial exposure.  *Dombrowski*, 954 F. Supp. at 1013; *see also Iorfido v. Domtar Paper Co., LLC*, 2024 WL 1346641, at *2-3 (W.D. Pa. Mar. 29, 2024)

(dismissing public nuisance claims as untimely).  Under the discovery rule, Plaintiff's claims are untimely for the reasons explained above.

The Court should, therefore, dismiss the FAC with prejudice.  Plaintiff was on notice of any claim in 2019, when he began working around lead-sheathed cables that had been in place for decades, and that allegedly posed a well-documented and regulated risk of preventable harm to utility-pole workers.  Plaintiff fails to allege any applicable tolling doctrine, and the limitations period for his claims thus expired in 2021.

## III.    The Negligence Claim In Count 1 Fails As A Matter of Law.

Plaintiff's claim for negligence in Count 1 fails because Plaintiff has not pleaded either the traditional elements of a negligence cause of action, or the additional elements unique to medical monitoring.  This separately compels dismissing Count 1.

### A.    Plaintiff does not plead the elements of negligence.

Plaintiff has the burden of pleading "a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct; a failure to conform to the standard required; a causal connection between the conduct and the resulting injury and actual loss or damage resulting to the interests of another."  *Morena v. S. Hills Health Sys.*, 462 A.2d 680, 684 n.5 (Pa. 1983).  On each element, the FAC falls short.

Verizon did not and does not owe Plaintiff a duty of care.  Duty is "a question of law for the court to decide."  *Wisniski v. Brown & Brown Ins. Co. of PA*, 906 A.2d 571, 576 (Pa. Super. 2006) (internal quotation marks omitted).   Federal law squarely places any duty on Plaintiff's actual employers, not on Verizon.  As set forth above, OSHA regulations impose on "employers" extensive duties to provide workers like Plaintiff with adequate training, protective equipment, workplace safety protocols, and other safeguards against exposure to lead from lead-sheathed

cables.  Plaintiff alleges that *Figure 8* and *Duda Cable* were his employers, and he cannot use a common-law negligence claim to shift those companies' duties to Verizon.

Pennsylvania common law precludes any allegation that Verizon owed Plaintiff a duty. Plaintiff allegedly encountered utility poles as a contractor for companies like Comcast, which have a statutory right of access.  *See* FAC ¶ 15; *see also* 47 U.S.C. § 224(f).  Verizon owes no duty to a third-party's contractor concerning known or obvious hazards in a workplace that the third-party has a statutory license to enter.  *See Cresswell v. End*, 831 A.2d 673, 677 (Pa. Super. 2003) (citing Restatement (Second) of Torts § 342); *Ott v. Unclaimed Freight Co.*, 577 A.2d 894, 898 (Pa. Super. 1990) (same).  Nor would it make sense to impose a duty on Verizon when it cannot forbid access to its telecommunications infrastructure, and when Plaintiff's employer is the entity controlling his conduct.  Indeed, even if Plaintiff had worked directly as a *Verizon* contractor, there still would be no duty under Pennsylvania law, which "places responsibility for the protection of the contractor's employees on the contractor and the employees themselves."  *Gay v. A.O. Smith Corp.*, 586 F. Supp. 3d 354, 360 (W.D. Pa. 2022) (internal quotation marks omitted) (no duty to worker at nuclear power station whose own employer was aware of the danger of asbestos); *see also Rudy v. A-Best Prod. Co.*, 870 A.2d 330, 334 (Pa. Super. 2005) (defendant had no duty to "experienced plumber/pipefitter who knew of the danger of asbestos through his employment and his membership in his union").

The FAC further fails to plead the other elements of negligence.  Without a duty, there is no breach.  Further, Verizon could not have proximately caused exposure when the presence of lead was widely known for decades, when lead was so "obvious" to pole workers that they "would at times scribble messages in it," and when federal workplace regulations already obligated Figure 8 and Duda Cable to provide protection against from lead exposure.  FAC ¶¶ 22, 52.  Lastly,

Plaintiff does not allege any concrete injury. *See* Arg. § I.A. Under Pennsylvania law, "there is generally no cause of action in tort until a plaintiff has suffered identifiable, compensable injury." *Schweitzer v. Consol. Rail Corp.*, 758 F.2d 936, 942 (3d Cir. 1985).

It makes no difference that Plaintiff seeks medical monitoring instead of personal-injury damages. Where Pennsylvania has recognized a claim for medical monitoring, it still requires at least a "significantly increased risk" of contracting a serious latent disease. *Barnes*, 161 F.3d at 138-39 (internal quotation marks omitted). The FAC fails to plead that element. Plaintiff offers the conclusory allegations that he had "direct and regular exposure to Verizon's lead-sheathed cables," and that lead "can cause" various conditions. FAC ¶¶ 15, 33, 37. But Plaintiff does not allege any basis for inferring that he is personally at "significantly increased risk" of developing any of those conditions. *Barnes*, 161 F.3d at 137 (internal quotation marks omitted). He does not claim that lead was ever detected in his system, much less at an elevated level. He also seeks testing just to determine whether lead can be detected in his blood and concedes that, even if it is, some "individuals exposed to lead have no symptoms." FAC ¶¶ 76, 49; *see also* Arg. § I.B. Plaintiff thus has not alleged the requisite injury for medical monitoring. *See In re Avandia*, 2011 WL 4006639, at *3 (E.D. Pa. 2011) (dismissing medical monitoring claim where the complaint "essentially tracks the elements of the claim, but without any specific facts alleged").

**B.    Plaintiff does not plead the other elements required for medical monitoring.**

To plead a claim for medical monitoring, Plaintiff must also allege the threat of developing a "serious latent disease," and a monitoring procedure that is "different from that normally recommended in the absence of exposure," "makes the early detection of the disease possible," and is "reasonably necessary." *Slemmer v. McGlaughlin Spray Foam Insulation, Inc.*, 2013 WL 5655480, at *2 (E.D. Pa. Oct. 17, 2013) (dismissing medical monitoring claim). The FAC does not adequately plead either element.

*First*, Plaintiff does not sufficiently allege a specific "serious latent disease" for which he needs medical monitoring. *Id.* Courts reject medical monitoring claims at the pleading stage where the plaintiff fails to allege, for instance, "which lung diseases" among "a host of different diseases" require monitoring. *Id.* at *3 (dismissing claim that sought medical monitoring for "neurological issues," "respiratory ailments," and "permanent lung damage and respiratory problems"). The FAC broadly alleges that lead "can cause" practically every generic ailment and symptom, from "mood changes" and "constipation" to general "neurological problems" and "decreased cognitive function." FAC ¶¶ 33, 35. Such "vague catch-all phrases" fail to allege a "serious latent disease." *Slemmer*, 2013 WL 5655480, at *3. Indeed, these allegations do not even meet the basic due process requirement of "properly put[ting] a defendant on notice of what the claim is or the grounds on which it rests." *Lafferty v. Sherwin-Williams Co.*, 2018 WL 3993448, at *4 (D.N.J. Aug. 21, 2018). There is no practical way to litigate a case for medical monitoring that sweeps in dozens of generalized medical conditions and non-specific symptoms with innumerable pathologies, some of which also allegedly correlate with lead exposure at high levels.

*Second*, Plaintiff fails to allege that medical monitoring would be "reasonably necessary," would differ from routine medical care, or would make the early diagnosis of lead-related disease possible. The FAC offers only a "formulaic recitation of the[se] elements," which is not enough to state a claim. *Slemmer*, 2013 WL 5655480, at *4 (citation omitted); *see also* FAC ¶¶ 117-21. Plaintiff merely describes procedures for identifying the presence of lead in the body. *See* FAC ¶¶ 46-50, 74-77. But these procedures do not detect the presence or future likelihood of any diagnosable disease for which Plaintiff seeks medical monitoring. Plaintiff likewise never alleges that early detection of any unspecified lead-related condition would help to improve prognoses or otherwise have a beneficial change in the course of treatment. *See also In re Paulsboro Derailment*

*Cases*, 746 F. App'x 94, 100 (3d Cir. 2018) (holding it is "inherently inconsistent to recommend medical monitoring in situations where there are no real good tests to establish that someone's going to come down with" the disease at issue (cleaned up)); *Bell v. 3M Co.*, 344 F. Supp. 3d 1207, 1227 (D. Colo. 2018) (dismissing medical monitoring claim where plaintiffs failed to plead "that medical examinations are reasonable and necessary to detect the claimed diseases"). For this reason as well, Count 1 fails to state a claim.

## IV.    The Negligence Per Se Claim In Count 2 Fails As A Matter Of Law.

Plaintiff cannot cure the deficiencies in his negligence claim by bootstrapping RCRA and HSCA into a negligence per se claim. *See* FAC ¶¶ 127-28. A separate negligence per se claim is contrary to Pennsylvania law, which holds that "[n]egligence per se is not a separate cause of action." *In re Wawa, Inc. Data Sec. Litig.*, 2021 WL 1818494, at *7 (E.D. Pa. May 6, 2021) (internal quotation marks omitted) (dismissing stand-alone negligence per se count); *see also In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 791 (3d Cir. 1999) (disallowing a stand-alone negligence per se claim). But no matter how it is pleaded, Plaintiff's negligence per se theory fails as a matter of law.

### A.    Plaintiff cannot use negligence per se to circumvent statutory limits.

Negligence per se cannot be used to "upset the Congressional scheme for enforcing" a statute. *Ries v. Amtrak*, 960 F.2d 1156, 1164 (3d Cir. 1992) (rejecting negligence per se claim based on the Occupational Safety and Health Act). Yet that is what Plaintiff seeks to do in Count 2. Both RCRA and HSCA require a private plaintiff to give regulators and the defendant at least 60 days notice of an alleged violation prior to bringing a claim. *See* 42 U.S.C. § 6972(b)(2)(A)-(C); 35 P.S. § 6020.1115. These notice requirements give the government an opportunity "to take responsibility for enforcing environmental regulations," and gives the alleged violator "an opportunity to bring itself into complete compliance." *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20,

29, 32 (1989) (internal quotation marks omitted) (affirming dismissal of RCRA claim for failure to provide statutory notice). The failure to allege compliance with these notice requirements precludes a standalone RCRA or HSCA claim, *see id*., and Plaintiff cannot avoid that outcome by turning statutory claims into a negligence per se claim, *see Ries*, 960 F.2d at 1164.

Plaintiff also cannot rely on RCRA as a predicate for seeking medical monitoring. Courts bar requests under RCRA for compensatory relief, including medical monitoring. *See Meghrig v. KFC W.*, 516 U.S. 479, 483 (1996) (quoting 42 U.S.C. § 6902(b)) (upholding dismissal of a RCRA claim to recover compensatory relief); *see also Wademan v. Concra*, 13 F. Supp. 2d 295, 305 (N.D.N.Y. 1998) (dismissing RCRA medical monitoring claim). RCRA's primary purpose is to reduce waste and "minimize the present and future threat to health and the environment." *Meghrig*, 516 U.S. at 483 (quoting 42 U.S.C. § 6902(b)). The statute "is not directed at providing compensation for past cleanup efforts," and the remedies available for an alleged RCRA violation are limited accordingly. *Id.* Plaintiff cannot use a negligence per se theory to circumvent RCRA's restriction and seek medical monitoring for an alleged RCRA violation. *See Wademan*, 13 F. Supp. 2d at 305; *see also In re E.I. du Pont de Nemours and Co. C-8 Personal Injury Litig.*, 2015 WL 4092866, at *23 (S.D. Ohio July 6, 2015) (following cases that dismiss RCRA-based negligence per se claims seeking compensatory relief).

### B.    Count 2 is contrary to Pennsylvania law limiting negligence per se.

Pennsylvania law separately requires dismissing Count 2 because "a general environmental protection statute" cannot support negligence per se. *Mest v. Cabot Corp.*, 449 F.3d 502, 518 (3d Cir. 2006) (citing *Wagner v. Anzon, Inc.*, 684 A.2d 570, 574 (Pa. Super. 1996)). Rather, to pursue liability based on negligence per se, a plaintiff must show that the underlying statute was intended "to protect the interest of the plaintiff individually, as opposed to the public." *Id.* (holding that negligence per se claims predicated on alleged violations of the Pennsylvania Air Pollution Control

Act failed as a matter of law under that statute's "Declaration of Policy" provision, which expressed a broad intent "to protect the 'public health, safety and well-being [of Pennsylvania] citizens.'" (quoting 35 P.S. § 4002(a))); *see also Wagner*, 684 A.2d at 575 (rejecting negligence per se claim based on an ordinance "enacted in 'furtherance of the health and welfare of [a city's] inhabitants'" (citation omitted)); Restatement (Second) of Torts § 288(b) (a statute cannot support negligence per se where it secures "to individuals the enjoyment of rights or privileges to which they are entitled only as members of the public").

The statutes underlying Count 2 are the same types of general environmental protection statutes that could not support negligence per se claims in *Mest* and *Wagner*. *See* FAC ¶¶ 127-28 (citing RCRA and HSCA). RCRA does not protect any specific group; its purpose is "to promote the protection of health and the environment" generally. 42 U.S.C. § 6902(a) (titled "Objectives and national policy"). Courts thus dismiss RCRA-based negligence per se claims because the statute does not "have the specific purpose of protecting a particular class of people," but instead protects the entire "public from soil and water contamination." *325-343 E. 56th St. Corp. v. Mobil Oil Corp.*, 906 F. Supp. 669, 688 (D.D.C. 1995). HSCA also contains its own "Declaration of Policy" provision materially identical to the provision that precluded the negligence per se argument in *Mest*. It was enacted to address the rights of "citizens of this Commonwealth … to clean water and a healthy environment," to safeguard "the public health and welfare of the residents of this Commonwealth," and "to protect the citizens of this Commonwealth against the release of hazardous substances." 35 P.S. § 6020.102(1), (2), (5). Clearly aimed at the public at large, neither RCRA nor HSCA can support a negligence per se claim. *See also Trinity Indus. v.*

*Greenlease Holding Co.*, 35 F. Supp. 3d 698, 724-25 (W.D. Pa. 2014) (rejecting negligence per se claim based on alleged violations of environmental statutes including RCRA).[4]

### C.    Plaintiff does not plead a statutory violation to support injunctive relief.

Plaintiff seeks remediation of all Verizon lead-sheathed cables and surrounding soil throughout Pennsylvania. *See* FAC p. 35 ¶ D. But there is no plausible allegation of, for instance, a state-wide "imminent and substantial endangerment to health or the environment" under RCRA, 42 U.S.C. § 6972(a)(1)(B), or statewide "release of a hazardous substance" under HSCA, 35 P.S. § 6020.1108(1), that proximately caused any alleged harm. Instead, Plaintiff alleges facts pertaining only to a single Pennsylvania site (at which he does not claim to have worked) that was allegedly contaminated with lead. FAC ¶ 28. Even as to that individual site, contamination alone "does not constitute an imminent and substantial endangerment" under RCRA. *Living Lands, LLC v. Cline*, 657 F. Supp. 3d 831, 848-49 (S.D. W. Va. 2023). It certainly is not enough to allege an "imminent and substantial" danger throughout ***the entirety*** of Pennsylvania, or to justify the inference that Verizon is somehow responsible for the statewide "release of a hazardous substance."

Moreover, Plaintiff—like the putative class—acted as a "utility pole worker[]." FAC ¶ 87. These are trained professionals who are on notice of the workplace hazard of lead and protected by decades-old federal laws that require employers like Figure 8 and Duda Cable to train their employees and issue protective equipment. Plaintiff cannot plausibly allege under these

---

[4] To the extent the FAC purports to incorporate into Count 2 any allegation under the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and Pennsylvania's Solid Waste Management Act ("SWMA"), any negligence per se claim under those statutes fails for the same reason. *See* FAC ¶¶ 104-05, 124; *see also Trinity*, 35 F. Supp. 3d at 725 (rejecting CERCLA-based negligence per se claim because "CERCLA is an environmental statute that is not tailored to protect a particular class of individuals" (internal quotation marks omitted)), *aff'd*, 903 F.3d 333 (3d Cir. 2018); *Russell v. Chesapeake Appalachia, L.L.C.*, 2014 WL 6634892, at *3-4 (M.D. Pa. Nov. 21, 2014) (dismissing negligence per se claim based on the SWMA).

circumstances a statewide issue requiring statewide relief.  Count 2 should be dismissed for these

reasons as well.  *See City of W. Sacramento v. R & L Bus. Mgmt.*, 2018 WL 3198118, at *4 (E.D.

Cal. June 27, 2018) (dismissing RCRA claim for failure to plausibly allege a violation).

## V.    The Public Nuisance Claim In Count 3 Fails As A Matter Of Law.

A specialized professional's allegations about an obvious occupational hazard in a

restricted work environment also are irreconcilable with the requirements of public nuisance.

Count 3 fails to allege either the "special injury" or "common right" necessary to state a claim

under Pennsylvania public nuisance law.

### A.    Plaintiff does not allege a special injury.

Public nuisance claims require some "wrong to the entire community" and, therefore, are

ordinarily "left to [the community's] duly appointed representatives."  Restatement (Second) of

Torts § 821C, cmt. a.  Where ***private*** individuals like Plaintiff seek to pursue a public nuisance

claim, they must plead a "special injury"—an element designed to "relieve the defendant of the

multiplicity of actions that might follow if everyone were free to sue for the common wrong."  *Id.*;

*see also Pa. Soc. for Prevention of Cruelty to Animals v. Bravo Enter., Inc.*, 237 A.2d 342, 349

(Pa. 1968) (relief for public nuisance ordinarily "must be sought by the proper public authorities").

This "special injury" requirement comprises two aspects.  Plaintiff must have (a) encountered the

nuisance while exercising a right common to the general public, but (b) suffered an injury different

in kind from that of other members of the public.  *See* Restatement (Second) of Torts § 821C;

*PECO v. Hercules, Inc.*, 762 F.2d 303, 315-16 (3d Cir. 1985).  Each requirement separately

precludes any public nuisance claim here.

Plaintiff's alleged exposure to telecommunications cables—which occurred only in a

restricted workspace with known hazards that is not open to the public, and with the protection of

federal workplace regulations—cannot support a public nuisance claim.  FAC ¶ 15.  The general

public has no right to ascend utility poles and work around suspended cables.  That alone precludes Plaintiff from pleading the special injury necessary to state a public nuisance claim.  The Third Circuit has rejected public nuisance claims in analogous circumstances.  Applying Pennsylvania law, that court found a private landowner could not pursue a public nuisance claim against a prior tenant for polluting the Delaware River because the landowner encountered the alleged harm only in "the exercise of its private property rights," *Hercules, Inc.*, 762 F.2d at 316, not in the exercise of a right available to the general public.

Plaintiff also fails to allege any "harm ***of a different kind*** from that suffered by other persons."  Restatement (Second) of Torts § 821C, cmt. b. (emphasis added).  Plaintiff claims only that utility-pole workers are at a "uniquely high risk" relative to the general public.  FAC ¶ 51 (emphasis added).  A "uniquely high" risk is by definition a difference of ***degree***, not of ***kind***.  *See Boteach v. Socialist People's Libyan Arab Jamahiriya*, 759 F. Supp. 2d 548, 551 (D.N.J. 2010) ("[A]llegations as to *greater extent* fail[] to sufficiently allege a different *kind* of injury."); *see also* Restatement (Second) of Torts § 821C, cmt. b (public nuisance plaintiffs cannot meet the "special injury" requirement by claiming they "suffered the same kind of harm" as the general public "but to a greater extent").  For this reason as well, Plaintiff cannot allege the special injury necessary to support Count 3.

### B.    The First Amended Complaint fails to allege interference with a common right.

Independent of the "special injury" element, a common law nuisance claim requires alleging interference with a "right common to the general public."  Restatement (Second) of Torts § 821B(1), which Plaintiff has failed to do.  A common right is one that is "collective in nature," *Atl. Richfield Co. v. Cnty. of Montgomery*, 294 A.3d 1274, 1284 (Pa. Commw. 2023) (en banc), like use "of a public highway or a navigable stream," Restatement (Second) of Torts § 821B, cmts.

b, g.  It is distinct from individual rights, such as the right "to be free from … injury by negligent actions of others." *Atl. Richfield*, 294 A.3d at 1284 (citing § 821B, cmt. g).

Courts thus reject as a matter of law the allegations made here, which generally invoke interference with "public health, welfare, safety, peace, comfort, and convenience."  FAC ¶ 134.  Under Restatement principles, the "allegation that defendants have interfered with the 'health, safety, peace, comfort or convenience of the residents of the [s]tate' standing alone does not constitute an allegation of interference with a public right."  *State v. Lead Indus., Ass'n, Inc.*, 951 A.2d 428, 453 (R.I. 2008) (quoting *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1114 (Ill. 2004)).  Holding otherwise would "change the meaning of public right to encompass all behavior that causes a widespread interference with the private rights of numerous individuals." *Id.* at 454; *see also City of Huntington v. AmerisourceBergen Drug Corp.*, 609 F. Supp. 3d 408, 475 (S.D. W. Va. 2022) (widespread distribution of opioids did not interfere with a public right); *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 727 (Okla. 2021) (same); *Alaska v. Walgreen Co.*, 2024 WL 1178352, at *3 (Alaska Super. Mar. 1, 2024) (same); *Beretta*, 821 N.E.2d at 1114 (rejecting nuisance claim predicated on "unreasonable jeopardy to health, welfare, and safety").  The sweeping interpretation of "public right" that Plaintiff proposes here is contrary to Pennsylvania's adherence to traditional common law of public nuisance.  *See Atl. Richfield Co.*, 294 A.3d at 1284; *see also* Restatement (Second) of Torts § 821B.  Count 3 should be dismissed.

**VI.    The Court Should Strike The Class Allegations.**

As a matter of law, Plaintiff cannot meet the requirements for an injunction class under Fed. R. Civ. P. 23(b)(2), or a damages class under Rule 23(b)(3).  *See* FAC ¶ 87 (purporting to proceed under both).  Even before the class certification stage, courts strike putative class claims that cannot allege the Rule 23(b)(3) elements—including predominance and adequacy—or the "cohesive" element under Rule 23(b)(2), which is similar to, but more "stringent" than,

predominance. *Gates v. Rohm and Haas Co.*, 655 F.3d 255, 269 (3d Cir. 2011); *see, e.g.*, *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 514 (W.D. Pa. 2019) (striking class allegations because plaintiffs failed to meet the predominance requirement); *Semenko v. Wendy's Int'l, Inc.*, 2013 WL 1568407, at *11 (W.D. Pa. Apr. 12, 2013) (same).

### A.    Individualized issues predominate in medical monitoring cases.

Requests for medical monitoring raise "too many individual issues" for class treatment. *Barnes*, 161 F.3d at 143.  Such claims necessarily implicate the "individual medical histories," *id.* at 142, of each putative class member—including whether each individual's age, health, and lifestyle mitigate or exacerbate the alleged risk of developing a serious latent disease, the degree of each person's alleged exposure to the relevant toxin, and whether a medical monitoring regime will be medically necessary or valuable for that particular individual.  *See id.*; *see also, e.g.*, *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 603, 624-25 (1997); *Gates*, 655 F.3d at 268-70; *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1122 (8th Cir. 2005) (collecting cases rejecting class treatment for medical monitoring claims); *Paige v. Phila. Hous. Auth.*, 2003 WL 22135961, at *4 (E.D. Pa. Aug. 18, 2003).

Pennsylvania federal courts have dismissed class allegations on the pleadings where individualized issues predominate.  In *Reilly v. Gould, Inc.*, for instance, the court dismissed class claims seeking medical monitoring for alleged lead exposure.  965 F. Supp. 588, 601-03 (M.D. Pa. 1997).  Based on the nature of the claims alone, the plaintiffs could not satisfy the "stringent requirement that common issues predominate over individual [ones]" due to the "the various ways individuals are exposed to lead" and "how such exposure varies from person to person."  *Id.* at 601, 603-05 (considering "[t]he possibility that some class members could have been exposed to lead from [various] origins"; that each individual has differing tolerances to lead absorption based

on "the age and sex of the party"; and that blood and bone lead levels vary depending on the amount of ingestion and distance from the contamination site); *see also Lafferty*, 2018 WL 3993448, at *4-5 (dismissing class allegations on the pleadings, concluding that plaintiff was not entitled to medical monitoring "on a *class-wide basis*," and reasoning that plaintiff failed to satisfy the "demanding" predominance requirement because "individual fact finding [would be] *essential* to determine whether … [the] hazardous substances impacted someone"). Similarly, the FAC demonstrates that, in multiple ways, individualized issues will predominate here.

*Exposure.* The fundamental question of exposure is itself too individualized to support class treatment. Each putative class member will have different levels of exposure for a variety of reasons, including: (1) given "the various ways individuals are exposed to lead," the extent to which each person encountered other sources of lead besides lead-sheathed cables; (2) "the amount of lead ingested and the duration of ingestion" from any source; (3) "individual tolerance to lead absorption" based on unique factors like age, gender, and medical history; (4) how long the person was employed as a utility pole worker; (5) how often the individual worked on poles with lead-sheathed cables; (6) whether those were Verizon poles; (7) the extent of any incidental contact with degraded cables; and (8) the extent to which the putative class member (properly) wore their protective equipment or took other safety precautions. *Reilly*, 965 F. Supp. at 603–05. Whether any putative class member has been exposed to harmful amounts of lead from Verizon cables is "an individual and highly factually intensive analysis." *Id*. at 604.

*Occupational risk.* Liability for a class alleging occupational exposure introduces even more individualized considerations for each putative class member. Those include: (9) the putative class member's employer; (10) the individual employer's adherence to workplace safety regulations and standards; (11) additional, collectively bargained safety measures; and (12) the

existence of employer- or union-provided lead screening or other medical services. *See Thompson v. Merck & Co., Inc.*, 2004 WL 62710, at *4 (E.D. Pa. Jan. 6, 2004) (striking class allegations in an employment discrimination suit where each plaintiff was exposed "to the alleged discrimination in varying ways, by different people, for different amounts of time and experienced different injuries"). These occupational considerations compound the already individual-specific analysis.

**The need for medical monitoring.** The requirement that each class member demonstrate a need for medical monitoring also raises "by definition" individual issues and cannot be "proved on a classwide basis." *Barnes*, 161 F.3d at 146 ("In order to prove the program he requires, a plaintiff must present evidence about his ***individual*** … history and subject himself to cross-examination by the defendant about that history." (emphasis added)); *Gates*, 655 F.3d at 268-69 (quoting *Barnes*, 161 F.3d at 146). The FAC concedes there is no common "danger point" for lead exposure. *Gates*, 655 F.3d at 267. Individuals exposed to toxic lead may excrete the lead altogether or "have no symptoms" from lead exposure. FAC ¶¶ 45, 49. Moreover, any manifestation of potential harm from lead exposure depends on factors like "[b]one-to-blood lead mobilization," which is "unpredictable" but "increases during periods of: advanced age; broken bones; chronic disease; hyperthyroidism, immobilization (e.g., bedridden); kidney disease; lactation; menopause; physiologic stress; and pregnancy." *Id*. ¶ 48. The need for medical monitoring here necessarily will depend on the putative "class members' individual characteristics and medical histories." *Gates*, 655 F.3d at 269.

**Medical conditions.** The breadth of potential medical conditions allegedly attributable to lead exposure introduces additional need for individualized inquiry. The risk of contracting ailments like "muscle weakness," "constipation," "trouble sleeping [or] concentrating," "irritability," "headaches," "memory problems," "infertility," or "reduced kidney function" will

naturally vary from person to person and depend on, among other things, each individual's level of exposure and underlying conditions.  FAC ¶¶ 33-35.  As in *Gates*, "each class member … may be more or less susceptible to diseases from exposure" to lead.  655 F.3d at 268; *see also Cashatt v. Ford Motor Co.*, 2021 WL 1140227, at *2 (W.D. Wash. 2021).  There is no common way to establish susceptibility for the broad array of conditions alleged in this case.

These circumstances bar any request for class relief.  "[T]here simply are not facts that could later be discovered that would render the complex, ubiquitous individualized questions of harm and causation that pervade this case amenable to collective resolution."  *Jones v. BRG Sports, Inc.*, 2019 WL 3554374, at *6 (N.D. Ill. Aug. 1, 2019).

### B. Untimeliness and claim-splitting also bar the putative class.

Independent of the inherently individualized nature of medical monitoring claims, the FAC cannot allege a request for class treatment for two other reasons.

***First***, the two-year statute of limitations that governs here adds to the individualized issues that predominate in this case.  *See Gonzalez v. Corning*, 317 F.R.D. 443, 523 (W.D. Pa. 2016), *aff'd*, 885 F.3d 186 (3d Cir. 2018) ("Determination of statute of limitations defenses can prevent a finding of predominance.") (collecting cases).  In addition to assessing each putative class member's claim for medical monitoring, the Court will have to individually assess when each person was on constructive notice of the claims, and whether he or she can invoke any tolling principle.  That further supports dismissing the putative class allegations at the pleading stage.  *See id.*; *Thompson*, 2004 WL 62710, at *4 (striking class allegations at the pleading stage where the defendant had "defenses that [were] unique to each individual claim" for each claimant, including the statute of limitations); *Pettrey v. Enter. Title Agency, Inc.*, 241 F.R.D. 268, 284 (N.D. Ohio 2006) (denying class certification where "the Court will have to make an individualized inquiry as

to the statute of limitations and whether equitable tolling or some other reason to excuse the statute of limitations applies"); *Moussouris v. Microsoft Corp.*, 2016 WL 6037978, at *8 (W.D. Wash. Oct. 14, 2016) (holding at the pleading stage that individualized issues render equitable tolling "unsuited to adjudication in a class proceeding."); *Slippery Rock Area Sch. Dist. v. Tremco, Inc.*, 2016 WL 3198122, at *19 (W.D. Pa. June 9, 2016) (striking fraud-based class claims).

**Second**, Plaintiff engages in improper claim-splitting. "The long-standing rule against improper claim splitting prohibits a plaintiff from prosecuting his case piecemeal and requires that all claims arising out of a single alleged wrong be presented in one action." *Acosta v. Gaudin*, 2017 WL 4685548, at *2 (W.D. Pa. Oct. 18, 2017) (internal quotation marks omitted). Here, the FAC disavows any request for "personal injury damages," but "expressly preserves" the purported right "to pursue the same in other litigation." FAC ¶ 10. A class representative who severs claims for "economic harm and harm in the form of personal injury" arising from the same underlying facts "may be … claim splitting, which is generally prohibited by the doctrine of *res judicata*." *Nafar v. Hollywood Tanning Sys., Inc.*, 339 F. App'x 216, 224 (3d Cir. 2009). This makes Plaintiff an atypical and inadequate putative class representative. Proceeding with a class claim solely for economic damages from alleged lead exposure is contrary to the interests of all putative class members who could now allege an existing personal injury claim from that exposure. The FAC as pleaded effectively will strip putative class members of any accrued personal injury claim.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss the FAC in its entirety.


Dated: May 9, 2024                                Respectfully submitted,

                                                 */s/ Anderson T. Bailey*
                                                 Anderson T. Bailey (Pa. 206485)
                                                 JONES DAY
                                                 500 Grant St., Ste. 4500
                                                 Pittsburgh, PA 15219
                                                 Ph: (412) 394-7250
                                                 Fx: (412) 394-7959
                                                 atbailey@jonesday.com

                                                 Leon F. DeJulius Jr. (Pa. 90383)
                                                 Sharyl A. Reisman (pro hac vice)
                                                 JONES DAY
                                                 250 Vesey Street
                                                 New York, NY 10281
                                                 Ph: (212) 326-3939
                                                 Fx: (212) 755-7306
                                                 lfdejulius@jonesday.com

                                                 Bridget K. O'Connor (pro hac vice)
                                                 JONES DAY
                                                 51 Louisiana Avenue, N.W.
                                                 Washington, DC 20001
                                                 Ph: (202) 879-3939
                                                 Fx: (202) 626-8585
                                                 boconnor@jonesday.com

                                                 *Counsel for Defendants*